(No. 63394

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JAMES B. ASHFORD, Appellant.

*Opinion filed February 11, 1988.—Rehearing
denied April 5, 1988.*

SIMON, J., concurring in part and dissenting in part.

SIMON, J., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, and James E. Chadd, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant, and James B. Ashford, of Menard, appellant *pro se.*

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Arleen C. Anderson, Assistant Attorney General, of Chicago, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

The defendant, James "Pud" Ashford, and Gary Jones were charged by indictment in the circuit court of Sangamon County with four counts of knowing murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(2)), four counts of felony murder based on armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(3)), and one count of armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2). The circuit court granted the defendant's motion for a severance and accepted his waiver of a jury trial. A bench trial followed, and the defendant was found guilty of all charges. The defendant waived a jury for the death sentencing hearing. The circuit court found beyond a reasonable doubt that the defendant was 18 years of age or older at the time of the offenses and the existence of two statutory aggravating factors: the defendant was convicted of murdering four persons (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3)), and he killed the victims in the course of an armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)). Finding no mitigating factors sufficient to preclude imposition of the death penalty, the circuit court sentenced the defendant to death for the murder convictions. The defendant was sentenced to a

30-year prison term for the armed robbery conviction. The death sentence has been stayed (107 Ill. 2d R. 609(a)) pending direct review by this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

## I. The Guilt Phase

The State presented the following evidence at trial. Ellen Michelle Lawson testified that on the evening of June 12, 1985, she went to buy some marijuana at the home of Lonnie Davis, at 1714 East Stuart Street in Springfield, Illinois. Four persons were there when she arrived, at approximately 10 p.m.: Lonnie Davis; Davis' girlfriend, Annette Singleton; his sister Janetta Leaks; and Bernard Bowen. Bowen greeted Michelle at the front door, which led to the home's living room. After letting her in, Bowen took a seat at the table in the dining room, a room immediately adjacent to the living room. On the dining room table was a scale, a mirror, a large freezer-type bag filled with a white powdery substance, and a briefcase containing several stacks of United States currency. Bowen was weighing the white substance, which Michelle believed was cocaine.

Michelle walked through the dining room to the kitchen, where she saw Leaks and Singleton. The two women were eating. She then went into the bedroom adjacent to the kitchen to talk with Davis. While the two were talking, the front doorbell rang several times. Michelle testified that Bowen answered the door and then exchanged a few words with Davis. Shortly afterwards, Michelle heard a voice outside, which she recognized as that of Gary Jones, say: "F—k that, let me in." Two gunshots followed. Davis, Leaks and Singleton all ran to the living room. Michelle remained in the bedroom and, from there, she heard the two women scream and run back into the kitchen.

Michelle attempted to flee the house by a door in the bedroom that led to the outside. The door, however, was locked with a dead-bolt and could not be opened without a key. After hearing three or four more gunshots, Michelle retreated down the basement stairs and hid behind the washer and dryer. Michelle heard screaming and three or four more shots. She heard Annette Singleton beg for her life to be spared, followed by four more shots. She then moved to the bedroom in the basement and hid between the bed and a wall.

As she lay on the basement floor underneath the bed, Michelle heard still four more shots and then the sound of footsteps descending the basement stairs. She testified that from underneath the mattress, she could see a pair of feet wearing canvas-type tennis shoes and the bottoms of a pair of black pants or jeans. While the feet were still in her sight, Michelle heard a voice from upstairs, which she recognized as that of Gary Jones. She then heard a voice, which she recognized as that of the defendant's, respond from the basement: "I'm coming. I'm coming, man." The defendant went back upstairs. Michelle remained under the bed about five minutes longer, during which time the house was silent. She then ventured upstairs.

Michelle observed the bodies of Davis, Leaks and Singleton on the kitchen floor, the bodies of the two women huddled close together under the kitchen table. As she headed for the front door, Michelle passed through the dining room. Michelle testified that the freezer bag of white powder and the money she had seen earlier on the dining room table were no longer there. She found Bowen's body in the living room near the front door to the house.

On cross-examination, defense counsel established that Michelle had spoken with the defendant only three or four times before, each time at a party. The defense

also brought out that Michelle had not told the police that she was a witness to the murders and armed robbery when first interviewed over one month after they occurred. Michelle explained that she did not tell police that she was at the Davis house during the murders and armed robbery because she was frightened of the defendant and Gary Jones. She further explained that she had gone away for over a month following the murders. When she returned and was interviewed by police, she did not know that the two men were in jail.

Anthony and Greg Phillips, brothers, testified that the defendant and Gary Jones stopped by their house on June 12, 1985, sometime between 9:30 and 11 p.m. Both testified that the defendant pulled out from under his shirt a plastic freezer bag full of white powder and said, "Jackpot." Greg Phillips also testified that the defendant said that he and Jones "had a shoot-out" at Davis' home. Greg stated that he was working on his van early in the morning on June 15, 1985, when the defendant came by and told him that he would pay him $100 to get rid of something. When Greg agreed, the defendant handed him a plastic bread sack that contained something heavy and hard. Greg buried the sack and its contents in front of a dog house in his backyard. The defendant later, and in the presence of his cousin Mack Alexander, asked Greg if he had disposed of the sack. Greg said that he had and the defendant then paid him $100, as agreed.

Greg Phillips also testified on direct examination that an unlawful restraint charge was currently pending against him. He testified that the State's Attorney had agreed to dismiss the charge and grant him immunity from prosecution for anything he might testify to so long as his testimony was truthful and consistent with the statement he gave police on June 21, 1985. On cross-examination, Greg conceded that he did not mention the

defendant's statement that the defendant and Jones had come from a shoot-out at the Davis home in an August 1985 interview with an investigator from the public defender's office. The defense elicited, erroneously, and without reference to the transcript of the grand jury proceedings, a concession from Greg that he also had failed to mention the defendant's incriminating statement when he testified before the grand jury. The record of Greg's testimony before the grand jury clearly shows that Greg did in fact testify that the defendant had stated that he had come from "a shoot-out" at Davis' home.

The State did not use Greg's recorded grand jury testimony for rehabilitation, apparently unaware that the defense, presumably through inadvertence, had misstated Greg's grand jury testimony. Instead, on redirect examination and over objection, the State was allowed to rehabilitate Greg with a statement he made to the police on June 21, 1985, in which he recounted how the defendant confessed to having come from a "shoot-out" at the Davis home.

Vanzella Freeman testified that the defendant came to her home on June 13, 1985, shortly after midnight. The defendant, who from time to time lived with Vanzella's granddaughter, Jacqueline Johnson, asked Vanzella to come to the door. When she refused and told him to leave, the defendant entered the house and went upstairs. The defendant was upstairs for about a minute and a half, and he then left the house. After the defendant had gone, Vanzella asked her grandson Keith to see if the defendant had left anything behind. On a bed in her granddaughter Evette's room were two bundles of money bound with rubber bands; on the floor was a plastic bag containing a light-colored substance.

Not knowing what was in the bag, Vanzella took both the money and the bag to a neighbor's house. After she

spoke with the neighbor, Vanzella placed the money and the bag containing the substance together in a larger plastic bag. Her first impulse was to throw the plastic bag in a nearby garbage dumpster, but she changed her mind and headed instead toward the defendant's house, a few blocks away. On the way, she ran into the defendant, who was walking down the same street, but in the opposite direction. Upon handing the bag to the defendant, the defendant stated, "It's mine."

Janet Walker and her sister Ramona Walker testified that the defendant and Mack Alexander came to Janet's home around 8 p.m. on June 15, 1985. The defendant had some cocaine, which he poured onto a plate and divided into lines. All four snorted the cocaine. The defendant told them that because they were all family (distant cousins), he was going to tell them something they were not to repeat. The defendant then told how he and Gary Jones went to Davis' home on June 12. He said that when Bowen opened the door, he pulled out his pistol and shot Bowen. He told them how one of the women in the kitchen had pleaded with him, "Pud, don't kill me." The defendant stated that he shot her because she called out his name.

Ramona did not recall if the defendant said whether he, Jones or both had shot the other women or Lonnie Davis. She recalled that the defendant said something about Jones being in the basement and stated that she had to leave the room several times, once because she had to vomit. Janet testified that the defendant said that he shot both the other women and Davis. The leg of one of the victims was shaking and so the defendant shot each victim in the head to make sure they were dead. Jones and the defendant then took the money and cocaine in two briefcases. They later split the money, each taking $5,000. The defendant stated that they had planned the robbery and explained that when that kind

of money and drugs are involved, "you don't leave anyone alive." Pointing his hand at each of their heads, as though he were holding a gun, the defendant stated: "I shot them like this." He stated further that he had paid someone $50 apiece to get rid of the guns used to kill the victims.

Mack Alexander testified that he saw Gary Jones approximately two weeks before the murders. Jones, according to Alexander, was carrying a .45-caliber semi-automatic handgun that belonged to the defendant. Alexander testified that on June 14, 1985, the defendant took him to Janet Walker's home. Because neither had a key, they had to gain entry to the home by climbing through a window. Once inside, the defendant went to a closet in the front room and retrieved a grocery bag. In the bag was cocaine and money. The defendant said that he and Jones had each gotten $5,000 from "the stick-up" at Davis' home. Alexander testified that he also was at Janet Walker's house the following day, June 15, when the defendant detailed to Janet, Ramona, and him how the four victims were murdered at the Davis house. The defendant explained that he killed all of the victims because he did not want to leave any witnesses.

On June 16, the defendant and Alexander made a trip to Decatur, Illinois. On the way there, the defendant said that he hoped the Phillips brothers had disposed of the guns used in the murders. He said that if they had not, it would be their problem because neither his nor Jones' fingerprints would be on the guns. The defendant also told Alexander that after the murders he used a police scanner radio to overhear any police reports regarding the slayings. When his and Jones' names were mentioned, the defendant took the money and cocaine and brought it to Vanzella Freeman's house. He said that he had left the money and cocaine there, but that Vanzella ran and gave it back to him.

When the defendant and Alexander returned to Springfield later in the day, they stopped by Greg Phillips' house. Alexander testified that the defendant asked Greg whether he had taken care of the guns. Greg said that he had and the defendant then paid him $100.

Dr. Grant Johnson, a forensic pathologist, testified that he made a preliminary examination of the victims at the crime scene and later performed the autopsies. He testified that Bernard Bowen had been shot once in the head and in the upper arm, and twice in the chest and in the right forearm. There were both entrance and exit wounds to the victim's head, and Dr. Johnson stated that one of the wounds to the victim's right forearm was probably created by the bullet which exited the victim's head and ricocheted off the floorboard of the house, splintering it. The recovered bullet, which Dr. Johnson believed was responsible for the head and forearm wounds, was compatible with a .45-caliber bullet, whereas the other bullets recovered from Bowen's body were of a smaller caliber. The primary cause of Bowen's death was an internal hemorrhage in the chest cavity resulting from one of the shots in his chest, which pierced the heart, and the other, which perforated the aorta.

Dr. Johnson testified that Lonnie Davis had been shot once in the head and in the left arm, and twice in the back. He stated that Annette Singleton had been shot once in the head, back, abdomen, and thigh. Janetta Leaks had been shot once in the head and in the back. The cause of death of Davis, Singleton, and Leaks was the same: destruction of brain tissue resulting from the gunshot to the head. Dr. Johnson testified that Davis may have been shot with two different caliber guns, as had Bowen.

Detective Thomas Todd of the Springfield police department testified that he found spent bullets and spent .357-caliber and .45-caliber casings at the crime scene,

which he forwarded to the crime lab for processing. Detective Todd testified that on June 13, 1985, he and another police officer found nine spent .357-caliber casings in a garbage dumpster directly across the street from 312 North 11th Street, the current residence of Jacqueline Johnson and also, apparently, the defendant. The police obtained a warrant to search the residence. A search of it revealed a magazine for a .45-caliber semi-automatic pistol, a box of .357-magnum ammunition and two spent bullets. Detective Todd, having compared the defendant's fingerprint card with the latent prints on the box of ammunition, identified two prints on the box of ammunition as the defendant's. On cross-examination, Detective Todd testified that he found a .45-caliber semi-automatic handgun under the body of Bernard Bowen.

Detective Thomas Murphy of the Springfield police department testified that Greg Phillips accompanied Detective Todd and him to Phillips' home on June 19, 1985. Detective Murphy dug up the plastic bread bag Greg had buried in the backyard. Inside was a .45-caliber semi-automatic pistol and a Colt Python .357-magnum revolver. Each gun had been separately wrapped in a brown paper-bag type of material.

Testifying with the aid of the Federal form required to document the closing of a sale of a firearm, William Buedel stated that, while a salesman at Fishman's Sporting Goods Store in 1980, he sold the defendant a Colt Python .357-magnum revolver bearing the same serial number as that of the revolver the police recovered from the buried bread bag. David Hawley, another salesman at Fishman's, testified that he sold the defendant a Colt .45-caliber semi-automatic pistol bearing the same serial number as that of the Colt .45-caliber semi-automatic pistol also recovered by the police.

Stephen Kasarsky, a forensic scientist with the State Police Forensic Laboratory, testified that he found a la-

tent fingerprint on the cylinder of the .357-magnum revolver. On the basis of 12 matching characteristics found in the latent print on the gun and in one of the defendant's inked prints, Kasarsky concluded that the fingerprint on the .357-magnum revolver was the defendant's.

Krail Lattig, a forensic scientist with the Illinois Bureau of Scientific Services, testified that he test fired the recovered .357-magnum revolver and the .45-caliber semi-automatic pistol. He then examined the fired test bullets and casings under a comparison microscope, together with the spent bullets and casings recovered by the police. Lattig explained that he was thus able to determine whether microscopic characteristics, called striations, indicated that the bullets and/or casings had been fired by the same weapon. Based on his examination, Lattig identified 12 bullets recovered from the victims or found at the crime scene as having been fired from the .357-magnum revolver on which the defendant's fingerprint was found. Lattig identified four of the nine spent .357-caliber casings, which were found in the dumpster across the street from the defendant's residence, as having been fired from the same .357-magnum revolver. Lattig stated that the other five casings were consistent with having been fired from the .357 magnum, but he could not make a positive identification. He also identified, as having been fired from the recovered .45-caliber semi-automatic pistol: one spent bullet, several bullet fragments, and three spent casings found at the crime scene; one spent bullet found in an unoccupied neighboring house; and the two spent casings found at the defendant's residence.

Finally, Lattig testified that he removed the magazine latch from the .45-caliber semi-automatic pistol—the part on the weapon that holds the magazine in place—to make a "tool mark" comparison test. He explained that he made a test mark in soft lead with the magazine latch

and then, using a comparison microscope, examined microscopic tool marks in the test against those on the .45-caliber magazine found at the defendant's home. Based on the results of the comparison, Lattig concluded that the magazine had been previously loaded into the .45-caliber semi-automatic pistol.

The defendant did not take the stand or call any witnesses. The circuit court found the defendant guilty on all counts and sentenced the defendant to death for the murder convictions and to a 30-year prison term for the armed robbery conviction.

The defendant first argues that the trial judge erred by allowing the State to rehabilitate Greg Phillips with a statement he gave to the police on June 21, 1985. The statement, which was consistent with Phillips' testimony on direct examination, recounted the defendant's visit to Phillips' house on the evening of June 12, 1985. It related how, after exclaiming "Jackpot," the defendant produced a bag of white powder from under his shirt and stated that he and Jones had just come from "a shoot-out" at Lonnie Davis' house. The State was permitted, over objection, to use the statement to rehabilitate Phillips following questioning on cross-examination as to his agreement to testify for the State, and questioning that elicited responses from Phillips that he did not mention the defendant's admission of his involvement in a "shoot-out" at Davis' house, either at the defendant's grand jury hearing on July 2, 1985, or during a subsequent interview with a defense investigator. As earlier noted, Phillips did in fact testify before the grand jury that the defendant stated that he and Jones had been involved in "a shoot-out" at Davis' house. This fact went unnoticed at trial, however, and the parties' briefs in this direct appeal afford us no indication that either the State or the defendant has, since trial, discov-

ered the flaw in the defense's impeachment of Greg Phillips.

The general rule is that proof of a prior consistent statement by a witness is admissible to rebut a charge or inference of recent fabrication or motive to testify falsely, provided the statement is made before the alleged motive to fabricate existed. (*People v. Emerson* (1983), 97 Ill. 2d 487, 500-01; *People v. Clark* (1972), 52 Ill. 2d 374, 389.) The defendant concedes that the State used Phillips' June 21 statement to rebut a charge of motive to testify falsely, but argues that the statement was made after the alleged motive had come into existence. He notes that Phillips was in jail on June 19, and unable to post bail on an apparently unrelated unlawful restraint charge, when he accompanied police to his house and told them where in the backyard they would find the bag he had buried. Phillips was released from custody after the recovery of the bag containing the two guns owned by the defendant.

We do not agree with the defendant that this sequence of events demonstrates that Phillips had a motive to testify falsely as early as June 19, 1985, two days before he gave his statement to the police. At best, they show only that he was motivated by his desire to be released from custody in revealing the location of the bag the defendant had paid him to dispose of. Moreover, Phillips did not make his statement in exchange for any promise of leniency or favorable treatment. The record shows that the State's Attorney did not even raise the possibility of an agreement to dismiss Phillips' unlawful restraint charge, in exchange for his truthful testimony, until sometime after he had made the statement, and the defense never sought at trial to show that the statement was tenue.ed with any such expectation. Further, even assuming that Phillips had such an expectation, and that it was error to allow his testimony to be bolstered by his

statement to the police, we find that any error in its admission was harmless beyond a reasonable doubt.

The trial judge limited the use of Phillips' police statement for its rehabilitative purpose; it was not admitted as substantive evidence of the defendant's guilt and was received only after the demonstrably flawed impeachment of Phillips. Even if it had been admitted as substantive evidence at the defendant's bench trial, the evidence would have been cumulative, adding nothing new to Mack Alexander's testimony that the defendant had stated that he and Jones had obtained their cocaine and $10,000 from a "stick-up" at Lonnie Davis' house. Indeed, the entire record in this case bespeaks the guilt of the defendant and compels the conclusion that the admission of the prior consistent statement was not a material factor in his convictions. Michelle Lawson, testifying as the only surviving witness, identified one of the assailant's voices as that of the defendant. Her voice identification was corroborated by evidence that the defendant had boasted of the murders to Mack Alexander and Janet and Ramona Walker, and had even demonstrated how he shot each victim in the head to be certain that no one was still alive. The graphic detail and the nature of the defendant's inculpatory statements and actions were devastating to his case, as was his statement to Vanzella Freeman, only hours after the slayings, that the money and cocaine she had found in her house were his. Together with the recovery of the defendant's guns, the ballistics evidence which showed that the guns were the murder weapons, the evidence of the defendant's fingerprint on one of the guns, and all of the other unrebutted physical evidence introduced, the proof of the defendant's guilt was, as the trial court found, simply overwhelming.

The defendant *pro se* raises two additional guilt phase issues not included in the brief of his appellate counsel.

In his *pro se* supplemental brief the defendant claims that he was prosecuted without an indictment, and that he was denied the effective assistance of counsel at the guilt phase of his trial. We find no merit to either claim.

The defendant's claim that the grand jury did not return a true bill, thereby formally indicting him, has no basis in fact. The true bill charging the defendant and Gary Jones appears on the reverse side of the armed robbery count, the ninth and last count in the charging instrument. It recites the counts for which the defendant has been convicted, and is properly signed by the foreman of the grand jury and the circuit judge who received it in open court. We turn next to the defendant's claim of ineffective assistance of counsel.

In *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, the Supreme Court established a two-part test for evaluating claimed denials of ineffective assistance of counsel in violation of the sixth amendment. First, the defendant must show that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms. There is a strong presumption that counsel's performance falls within "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065. As the Court explained:

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at

the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065, quoting *Michel v. Louisiana* (1955), 350 U.S. 91, 101, 100 L. Ed. 83, 93, 76 S. Ct. 158, 164.

Second, the defendant must show that any deficiencies in counsel's performance prejudiced his or her defense. In determining whether any errors prejudiced the defense, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding[ ]." (*Strickland*, 466 U.S. at 693, 80 L. Ed. 2d at 697, 104 S. Ct. at 2067.) Instead, the defendant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) We find that the defendant has not met his burden under either prong of *Strickland* to establish his claim of ineffective assistance of counsel.

The defendant first contends that his counsel was ineffective in failing to call certain persons to testify. However, the defendant concedes that the decision to call a particular witness is a matter of trial strategy, and we have stated that an ineffective assistance of counsel claim "which arises from a matter of defense strategy will not, of course, support a claim of ineffective representation." (*People v. Madej* (1985), 106 Ill. 2d 201, 214.) This is especially true where, as here, the circumstances show that the individual's testimony would likely have

been harmful to the defendant or would have had no probative value to a determination of guilt or innocence.

The defendant argues, for example, that his counsel was incompetent for not subpoenaing his codefendant, Gary Jones, to testify. But it would surely have been an incomprehensible, if not utterly egregious, trial tactic to have sought Jones' testimony. Having successfully moved for severed trials on the ground that Jones had made statements which, if introduced at trial, would be prejudicial to him, we cannot understand how the defendant can now fault counsel for failing to subpoena Jones.

The defendant would also fault counsel for failing to subpoena as witnesses a person named Debra Powe and another known only as "Carlos." He maintains that *if* Debra Powe and "Carlos" testified, refuting Michelle Lawson's testimony in some way, his trial *may* have ended differently. Nowhere in the defendant's *pro se* brief, however, does the defendant suggest how either Debra Powe or "Carlos" could have disputed Michelle's account of the murders, or her voice identification of the defendant. He states only that "counsel's investigative techniques excluded the need to subpoena these important witnesses who may have been able to shed more light in each of their own perspective ways on this matter."

The only documents in the record that make reference to Debra Powe and "Carlos" are two Springfield police investigative reports of police interviews of Michelle Lawson. The first police report summarizes an interview with Michelle on July 27, 1985, over a month after the murders. The interview was prompted after police received information that Michelle may have been at the Davis residence prior to or during the time the murders were committed. The report states that Michelle said that she had been at Debra Powe's house on the night of the murders. Between 10 and 10:30 p.m. she

left Powe to go to Lonnie Davis' house to buy some marijuana. Michelle said that she was at the Davis home for only 15 or 20 minutes and did not tell the police that she was present when the murders were perpetrated. She told the police that on her way driving to Debra Powe's house early the following morning, she was flagged down by a black male whom she knew as "Carlos," whose last name possibly was "Acres." "Carlos" requested a ride to a nearby hotel and, according to Michelle, on the way there "Carlos" told her of the murders that occurred at Davis' house the preceding evening. Michelle dropped "Carlos" off and then went to Debra Powe's house. Michelle stated that she told Powe about the murders.

Michelle was again interviewed by police on August 14 and August 22, 1985. A second police investigative report summarizes Michelle's second and third interviews. During both interviews Michelle told police that she had been at Debra Powe's house before going to Lonnie Davis' house and that she was at the Davis home at the time of the murders. As she did at trial, Michelle related her knowledge of how the murders were committed and how she had recognized the assailants' voices as those of the defendant and Gary Jones.

Michelle explained at trial that after the murders she feared for her safety and went away for over a month. When she returned, she did not tell the police what she knew about the murders because she still feared the defendant and Gary Jones and did not know that the two were in jail. After learning that the defendant and Jones were "locked up," her fright passed and Michelle came forward with her knowledge of the murders and armed robbery. The record shows that defense counsel vigorously cross-examined Michelle. Counsel underscored Michelle's failure to tell police of the crimes when first interviewed and attacked Michelle's voice identification

of the defendant, establishing that she had talked with him only several times before, each time at a party. Nevertheless, Michelle's trial testimony was convincing because her account of the murders and armed robbery was corroborated largely by the inculpatory statements of the defendant himself, as well as by all of the other uncontroverted evidence establishing his guilt.

The defendant has not favored us with affidavits of Debra Powe or "Carlos" setting forth what, if anything, each could have testified to at the defendant's trial. Nor does he even suggest how their testimony would have been helpful to him, except for his speculative assertion that they may have been able to contradict Michelle Lawson's testimony. We cannot conceive of how "Carlos" could have helped the defense. Assuming that "Carlos" even exists and that he told Michelle of the murders, evidence of that fact would not have undercut Michelle's testimony as the only witness to the murders and armed robbery. There is no evidence that "Carlos" had any role in the crimes and the defendant's inculpatory statements foreclose that possibility. Because the defendant has not demonstrated that "Carlos" would have testified favorably for him, and in view of the heavy measure of judicial deference *Strickland* requires, we find that counsel's decision not to subpoena "Carlos" was a reasonable strategic decision. The defendant has similarly failed to demonstrate that Debra Powe would have testified favorably and to therefore rebut the strong presumption that counsel's strategic decision not to subpoena her to testify fell "within the wide range of reasonable professional assistance." (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) Even assuming, *arguendo*, that counsel's strategic decision not to subpoena Ms. Powe or "Carlos" as witnesses was not the result of a reasonable professional judgment, we would conclude that the defendant cannot

meet the second prong of *Strickland.* The evidence of the defendant's guilt was overwhelming and the defendant has failed to demonstrate on this record that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

The defendant complains also, in a single sentence in his *pro se* brief, that counsel was ineffective by not affording him a "voice analysis." No explanation is given as to what the defendant means by a "voice analysis," and we can only presume that what the defendant has in mind is a spectrographic analysis of his voice. We need not lengthen this opinion with an extended discussion of the controversial technique of spectrographic voice identification (See generally A. Moenssens & F. Inbau, Scientific Evidence in Criminal Cases §§12.01 through 12.08 (2d ed. 1978)), or make a determination as to whether the technique has attained a measure of reliability and acceptance in the relevant scientific community such that the so-called "voiceprint" evidence it yields is properly admissible in criminal proceedings. Judging from the reported decisions, it is abundantly evident that there is a split of authority on the admissibility of "voiceprint" evidence, an issue which has not had the benefit of appellate review in this State. (See, *e.g., United States v. McDaniel* (D.C. Cir. 1976), 538 F.2d 408 ("voiceprint" evidence held inadmissible); *State v. Gortarez* (1984), 141 Ariz. 254, 686 P.2d 1224 (same); *People v. Kelly* (1976), 17 Cal. 3d 24, 549 P.2d 1240, 130 Cal. Rptr. 144 (same); *Cornett v. State* (Ind. 1983), 450 N.E.2d 498 (same); but see *United States v. Williams* (2d Cir. 1978), 583 F.2d 1194, *cert. denied* (1979), 439 U.S. 1117, 59 L. Ed. 2d 77, 99 S. Ct. 1025 ("voiceprint" evidence held admissible); *Alea v. State* (Fla. App. 1972), 265 So. 2d 96 (same); *Commonwealth v. Lykus* (1975), 367 Mass. 191,

327 N.E.2d 671 (same).) We need not address the admissibility issue here, for the defendant cannot possibly show that the technique had any relevant use in his case. Simply stated, the technique is employed, if at all, for the purpose of identifying the recorded voice of an unknown person. (A. Moenssens & F. Inbau, Scientific Evidence in Criminal Cases §12.01 (2d ed. 1978).) There was, however, no recording of a voice in this case, the identity of which was in issue. Accordingly, the defendant cannot plausibly claim that his counsel was constitutionally ineffective for not affording him a spectrographic analysis of his voice.

Having concluded that no reversible error occurred during the guilt phase of the defendant's trial, we affirm the defendant's convictions on all charges and turn to his allegations of error concerning the sentencing phase.

## II. The Sentencing Phase

The defendant first challenges the validity of his death sentence on the ground that his presentence report impermissibly commented on his right to remain silent. Prior to the defendant's sentencing hearing, the trial judge ordered a presentence investigation and report. In doing so, the judge noted that a presentence report was required for sentencing on the defendant's armed robbery conviction (Ill. Rev. Stat. 1985, ch. 38, par. 1005—3—1), even though not required for the purpose of sentencing a defendant for murder where the State seeks imposition of the death penalty. (See *People v. Madej* (1985), 106 Ill. 2d 201; *People v. Gaines* (1981), 88 Ill. 2d 342.) The defendant observes that the probation officer who conducted the presentence investigation wrote in the presentence report that the defendant refused to cooperate and was hostile towards her. The defendant does not dispute that he was hostile to, and uncooperative with, the probation officer. Rather, he ar-

gues that such comments improperly referred to his right to remain silent.

The State responds that the issue is waived because the defendant filed no post-trial motion after his sentencing hearing. (*People v. Szabo* (1986), 113 Ill. 2d 83, 93.) We do not decide the State's waiver contention since it is clear that, on the merits, the defendant's claim must fail.

The fifth amendment right against compelled self-incrimination is available, not only at guilt phase, but also at the sentencing phase of a capital murder trial. (*Estelle v. Smith* (1981), 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866.) Whatever information the defendant provided the probation officer could have been used against him at the sentencing proceeding, and he therefore had a right to remain silent. He exercised that right, but evidently did so in a manner fairly characterized by a hostility towards the probation officer. We do not agree with the defendant that the word "hostile," as used by the probation officer, suggested that he was somehow acting improperly by remaining silent. In context, the word was used to describe the defendant's behavior in invoking his right to remain silent and cannot be reasonably read to suggest that the defendant was attempting to invoke a right he did not have. Further, the presentence report makes clear that the comments on the defendant's uncooperativeness were included to explain why the primary source of information for the report's data on the defendant's personal background was an adult probation file made four years earlier. Moreover, even if we were to consider the comments improper, the record shows that the probation officer did not testify at the sentencing hearing and the State did not refer to the comments at any point during the proceeding. It is, of course, well established that where a sentencing hearing is conducted before the trial judge acting without a jury, "the trial judge is presumed to consider only competent and rele-

vant evidence in determining sentence." (*People v. Morgan* (1986), 112 Ill. 2d 111, 144; *People v. Eddmonds* (1984), 101 Ill. 2d 44, 66.) We would observe that the defendant offers nothing to rebut the presumption, and that the record reflects that the trial judge, in imposing the defendant's sentence of death, neither referred to the probation officer's comments nor even mentioned the presentence report itself.

The defendant argues next that his oral and written waivers of a sentencing jury were not knowingly and intelligently made since the record does not show that he was informed by either the trial court or counsel that a jury's decision to impose the death penalty must be unanimous. The defendant observes that our court has consistently declined to fashion a rule requiring trial courts to inform defendants at capital sentencing hearings of the jury unanimity requirement before accepting a jury waiver. (*People v. Hall* (1986), 114 Ill. 2d 376, 411-12; *People v. Madej* (1985), 106 Ill. 2d 201, 220-21; *People v. Albanese* (1984), 104 Ill. 2d 504, 534-36.) He invites us to reconsider those decisions and yet gives us no reason for departing from our considered holdings. We therefore decline his invitation.

The record demonstrates that the defendant knowingly and intelligently waived a sentencing jury. A typewritten jury waiver form, signed by both the defendant and his counsel, indicates that the defendant conferred with counsel and, "after being fully advised," elected to waive a sentencing jury. Moreover, the record reflects that before the trial judge accepted the jury waiver, the judge painstakingly admonished the defendant of his right to a sentencing jury and of the respective roles and functions of a jury and a judge in a capital sentencing proceeding. The trial judge further informed the defendant that if a sentencing jury was waived, it would then be his duty to consider the evidence presented at the

sentencing hearing and determine the sentence. The defendant stated that he understood his right to a capital sentencing jury and the consequences of a jury waiver. The record thus leaves no doubt that the defendant made a knowing and intelligent waiver of a sentencing jury, and we find no error in the judge's failure to inform the defendant that a jury's decision to impose the death penalty must be unanimous.

The defendant next contends that his sentence of death is disproportionate to the life imprisonment sentence received by his accomplice in the crimes, Gary Jones. Citing *People v. Perez* (1985), 108 Ill. 2d 70, the State initially responds that the defendant is not entitled to a comparison on appeal between his sentence of death and Jones' sentence of life imprisonment. In so responding, the State misconstrues *Perez*. As the defendant correctly observes, *Perez* did not involve any issue of alleged unreasonable disparity between sentences of codefendants.

At issue in *Perez* was whether a defendant is entitled to a cross-case comparison of his death sentence with penalties imposed in other instances where similar crimes had been committed. We decided there that a defendant was not so entitled, relying on the Supreme Court's recent decision that the Federal Constitution does not require a State appellate court to undertake a cross-case comparison to ascertain whether a defendant's sentence of death is proportional to the penalty given in similar cases. (*Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871.) The defendant is not asking us to compare his death sentence with the punishment fixed in other cases where a defendant was convicted of murdering four persons and the killings occurred during the course of an armed robbery, or any of the other forcible felonies enumerated in section 9—1(b)(6)(c) of the Criminal Code of 1961 (Ill. Rev. Stat.

1985, ch. 38, par. 9—1(b)(6)(c)). Far from the broad-based inquiry that the Supreme Court has held is not constitutionally required, the defendant asks only that we examine his sentence of death in light of the life sentence of his accomplice, who he claims was equally culpable. This is precisely the same kind of limited inquiry our court has performed in numerous capital cases, both before *and* after *Perez*. (*People v. Erickson* (1987), 117 Ill. 2d 271; *People v. Owens* (1984), 102 Ill. 2d 145; *People v. Szabo* (1983), 94 Ill. 2d 327 (*Szabo* I); *People v. Gleckler* (1980), 82 Ill. 2d 145; see also *People v. Szabo* (1986), 113 Ill. 2d 83 (*Szabo* II) (finding that the issue of sentencing disparity between codefendants was fully considered and decided against the defendant in *Szabo* I).) Therefore, the State's reliance on *Perez* is misplaced.

To aid our review, the record has been supplemented with transcripts of the guilt and sentencing phases of Jones' trial. We begin our examination of the defendant's contention with their summary.

At the time of the defendant's sentencing, Jones was awaiting trial on the same murder and armed robbery charges. Presiding at Jones' subsequent jury trial was a judge other than the one who sat at the defendant's bench trial. As a part of its case in chief, the State called Michelle Lawson. Michelle testified that the defendant was in the basement, where she had concealed herself, and Jones was upstairs when she heard several shots fired upstairs. The State also called Anthony and Greg Phillips. Anthony Phillips testified that Jones stated that, as he was leaving the Davis residence, he saw Bernard Bowen. Jones stated that Bowen, whom the defendant had previously wounded, reached for his gun and so he shot Bowen. According to Anthony, Jones stated that he fired his gun three times in the Davis residence. On cross-examination, Anthony testified that Jones stated that the defendant had shot all four vic-

tims. Greg Phillips similarly testified that Jones stated that Bowen had already been wounded by the defendant when, as he was trying to flee the scene, he saw Bowen reach for his gun. As Bowen went for the gun, Jones shot him.

Brenda Lee testified that she was at Jacqueline Johnson's residence with the defendant and Gary Jones in early May or late June of 1985. Brenda was in a room downstairs with the defendant and Jones, while Jacqueline was upstairs. The defendant and Jones were talking about a certain handgun. Jones produced a handgun from the waist of his pants and handed it to the defendant. The defendant copied a number from the gun onto a piece of paper and then handed the gun back to Jones. Brenda identified a photograph of the .45-caliber semi-automatic handgun that had been buried in the Phillips' backyard as being a photograph of the same gun that Jones had displayed for the defendant.

Albert Jackson testified that on June 10, 1985, two days before the murders, Jones was carrying a .45-caliber semi-automatic handgun in the waistband of his pants. At one point, Jones removed the gun from his waistband and Jackson was able to get a good look at the gun. Jackson identified a photograph of the .45-caliber handgun recovered from the Phillips' backyard as being a photograph of the same .45-caliber semi-automatic handgun that was in Jones' possession two days before the murders.

The autopsy evidence established that Bowen had been shot three times: twice in the chest and once in the head. The chest wounds were "in all likelihood" inflicted while Bowen was standing, whereas the head wound was compatible with one inflicted while the victim was kneeling or lying on the floor. The chest wounds were caused by .357-caliber bullets, which were recovered; the head wound was caused by a .45-caliber bullet, which also was

recovered. Both chest wounds, one to the heart and the other to the aorta, were probably inflicted close together in time so that Bowen would have collapsed in a matter of seconds and could have lived no more than 30 or 40 seconds. The autopsy evidence also showed that Lonnie Davis might have been wounded once in the arm by a .45-caliber bullet; his other wounds were caused by .357-caliber bullets, all of which were recovered. Although the wound to the arm appeared to be compatible with that caused by a .45-caliber bullet, no bullet was recovered for positive identification.

Jones presented no evidence during the guilt phase of his trial. The armed robbery count and four murder counts were submitted to the jury, which was given general verdict forms. The issues instructions for armed robbery allowed the jury to find Jones guilty if the State proved beyond a reasonable doubt that his actions, or those of Ashford based on accountability, established the requisite elements of the crime. The issues instructions for each murder count allowed the jury to find Jones guilty on one or both of two alternative propositions. The first required proof beyond a reasonable doubt that Jones knew that the acts causing the death of the particular victim—either Jones' acts or Ashford's based on accountability—created a strong probability of death or great bodily harm. The second required proof beyond a reasonable doubt that in the course of the acts which caused the death of the particular victim—either Jones' acts or Ashford's based on accountability—Jones was committing or attempting to commit armed robbery.

The jury found Jones guilty on all counts. The first phase of the death penalty hearing was held before the trial judge sitting alone, Jones having waived his right to a sentencing jury. At the hearing on Jones' eligibility for the death penalty, the State introduced evidence that the defendant was over the age of 18 at the time of the of-

fenses. In support of its position that Jones was eligible for the death penalty under both the felony murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)) and the multiple-murder aggravating factor provisions (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3)), the State asked the trial judge to take judicial notice of Jones' convictions for murder and armed robbery.

At the hearing to determine his eligibility for the death penalty, Jones introduced autopsy evidence to the effect that, assuming that Bowen was first wounded in the chest by the .357-caliber bullets, Bowen may already have been dead when the .45-caliber head wound was inflicted. Jones also introduced transcripts of the testimony of Janet and Ramona Walker and Mack Alexander at the defendant's trial.

Following arguments by counsel, the judge announced his decision that the State had failed to prove beyond a reasonable doubt any statutory aggravating factor to establish Jones' eligibility for the death penalty. Among his findings leading to that conclusion were: that there was no evidence that Jones went to the Davis residence with an intent other than to participate in an armed robbery; there was no evidence that Jones entered the residence armed, though evidence showed that Jones possessed a .45-caliber pistol prior to the shootings; and that if Jones, as he was leaving the crime scene, did shoot Bowen, more likely than not Bowen was already dead. The judge concluded:

> "Now, the State claims that the death penalty can be imposed on either of two theories; one, the multiple murder theory inasmuch as *** there was more than one victim here, or the felony murder theory that a murder was committed in the course of a felony for which the death penalty might be imposed. I have to find that that [has] been made clear to the court through the evidence beyond a reasonable doubt and I can't make that finding.

From the evidence available to this court, I am unable to determine beyond a reasonable doubt that either theory is applicable here due to a lack of showing that the defendant's mental state was that which is required by section 9—1(b)(3), the multiple murder [provision], or that any of the victims were actually killed by defendant Jones in the course of [the] felony of armed robbery. The court is not convinced beyond a reasonable doubt that defendant Jones personally inflicted injuries on any of the victims substantially contemporaneously with the physical injuries caused by Ashford on any of the victims.

Having made those findings, the court is of the opinion that only one sentence may be imposed. That is the sentence of natural life.

The defendant Jones, you are sentenced hereby to natural life for the four murders for which you are accountable of the four victims in this case."

It is the defendant's contention that his death sentence is disproportionate to Jones' sentence of life imprisonment because the two are "as similarly situated as two codefendants have ever been." In support of his contention, the defendant submits that evidence at Jones' trial showed that Jones shot Bernard Bowen in the head with a .45-caliber pistol, that he fired his gun three times, and that he shot Lonnie Davis in the arm. He notes also that the evidence at his trial showed that he and Jones planned the armed robbery together and split the spoils of their crimes evenly. He notes further that Jones had a "far more significant history of prior criminal activity." In this last regard, the defendant observes his four prior convictions were for various misdemeanor offenses, whereas Jones had four prior felony convictions. Thus, according to the defendant, it follows that he and Jones are equally culpable for the murders and there is no justification for their disparate sentences. We disagree.

Certainly, one of the most arduous tasks facing the criminal court judge is that of fixing an appropriate sentence. The combination of variables which must be considered is infinite, or nearly so, and the task is made no less difficult in the context of a capital case. In the same vein, the Supreme Court has observed: "Sentencing judges are vested with wide discretion in the exceedingly difficult task of determining the appropriate punishment in the countless variety of situations that appear. The Constitution permits qualitative differences in meting out punishment and there is no requirement that two persons convicted of the same offense receive identical sentences." (*Williams v. Illinois* (1970), 399 U.S. 235, 243, 26 L. Ed. 2d 586, 594, 90 S. Ct. 2018, 2023.) Although great deference is to be accorded a trial judge's sentencing decision (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154), there can be no such deference where an arbitrary and unreasonable sentencing disparity exists between equally culpable codefendants. "A disparity between sentences will not be disturbed, however, where it is warranted by differences in the nature and extent of the concerned defendants' participation in the offense." *People v. Godinez* (1982), 91 Ill. 2d 47, 55.

The record before us thoroughly refutes any notion that the defendant and Jones were equally culpable in the murders of the four victims. Although the defendant and Jones planned the crimes together and evenly split the proceeds of their criminal venture, the evidence, both at the defendant's and at Jones' trial, showed that the two had anything but equal roles in the actual killings. The defendant's self-incriminating account of the murders, as testified to by the defendant's cousins, established that it was the defendant, not Jones, who shot all four of the victims. When a leg of one of the victims moved, it was the defendant who shot each victim to be sure that no one would be left alive. By contrast, the

strongest evidence of Jones' participation in the slayings was his statement to the Phillips brothers that he shot a single victim, Bernard Bowen. However, the evidence also showed that Bowen had already been seriously and perhaps fatally wounded by the defendant. Somewhat weaker was the State's evidence that Jones, who was seen armed with the defendant's .45-caliber pistol two days before the murders, might have shot Lonnie Davis in the arm. The arm wound, unlike any of Davis' wounds that were of a fatal nature, was compatible with a wound that could be caused by a .45-caliber bullet; however, the arm wound was of a "through and through" nature and thus no bullet was recovered for identification.

In view of the overwhelming evidence that the defendant was essentially the triggerman in the execution of the crimes, firing all or nearly all of the fatal shots, we conclude that his culpability was measurably greater than that of his accomplice, Gary Jones. We conclude, therefore, that the defendant's sentence of death is not excessive or disproportionate to the life sentence Jones received. That Jones had a significant history of prior criminal activity, and the defendant did not, does not alter our conclusion. To be sure, the absence of a significant history of prior criminal activity is to be considered in mitigation. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)(1).) It is a circumstance that, when compared against the nature and gravity of the crimes for which sentence is to be imposed, bears upon the question of rehabilitation. Here, the judge at the defendant's death penalty hearing expressly found that the defendant had no significant prior criminal background and considered it a mitigating factor. However, the judge found there were no mitigating factors sufficient to preclude the imposition of a sentence of death. Significantly, the defendant does not dispute the finding of no mitigation suffi-

cient to preclude the imposition of the death sentence, and we are unable to say that the absence of a significant history of prior criminal activity was mitigation sufficient to preclude meting out a death sentence for the defendant's acts in murdering the four victims. (Jones' cause is not before us on appeal, and we therefore express no opinion as to the correctness of the decision the other sentencing judge made in finding Jones ineligible for the death penalty.)

Finally, the defendant raises a number of challenges to the constitutionality of the Illinois death penalty statute. We have previously considered and rejected claims that the discretion statutorily vested in a State's Attorney to seek the death penalty results in the arbitrary and capricious imposition of the death penalty. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 362; *People v. Owens* (1984), 102 Ill. 2d 145, 160; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 535-36, *cert denied* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 1603.) We have also considered and rejected the argument that the Illinois death penalty statute lacks adequate safeguards to prevent the arbitrary and capricious imposition of death sentences. (*People v. Perez* (1985), 108 Ill. 2d 70, 96-98; *People v. Albanese* (1984), 104 Ill. 2d 504.) This court has also held that the Illinois death penalty statute is not unconstitutional because it bars the sentencer from considering sympathy for a defendant. (*People v. Morgan* (1986), 112 Ill. 2d 111, 145-46; accord *California v. Brown* (1987), 479 U.S. 538, 93 L. Ed. 2d 934, 107 S. Ct. 837.) Nor is the Illinois death penalty statute constitutionally infirm because it exempts from its operation those persons who are fit to stand trial only with the aid of certain special assistance. (*People v. Whitehead* (1987), 116 Ill. 2d 425, 460-62; *People v. Perez* (1985), 108 Ill. 2d 70, 94-95.) Lastly, our court has found no merit in the argument that the Illinois death penalty statute fails to

narrow to a unique and cognizable class those persons eligible for capital punishment. (*People v. Shum* (1987), 117 Ill. 2d 317, 373-74; *People v. Whitehead* (1987), 116 Ill. 2d 425, 463-65.) Because our court has fully considered and rejected each of the defendant's contentions, and because the defendant presents no argument warranting reconsideration, we adhere to those decisions governing their disposition against the defendant.

For the reasons stated, the judgment of the circuit court of Sangamon County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, May 24, 1988, as the date on which the sentence of death entered in the circuit court is to be implemented. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*

JUSTICE SIMON, concurring in part and dissenting in part:

I concur in the portion of the majority opinion that affirms the defendant's conviction. I believe, however, that the defendant's waiver of his right to be sentenced by a jury was not knowingly and intelligently made, and I therefore dissent from the affirmance of the death sentence. The defendant was not told prior to waiving a jury for sentencing that a jury's decision to impose the death penalty must be unanimous. As I have stated before (*People v. Hall* (1986), 114 Ill. 2d 376, 422 (Simon, J., concurring in part and dissenting in part); *People v. Buggs* (1986), 112 Ill. 2d 284, 296 (Simon, J., specially

concurring)), fundamental fairness requires that trial judges correctly inform all capital defendants of the unanimity requirement before accepting jury waivers at death sentencing hearings.

This court has previously taken the position that it is the responsibility of the defendant's attorney to be certain that the defendant understood the rule and that his waiver was knowing and intelligent. (*People v. Morgan* (1986), 112 Ill. 2d 111, 142.) This case, however, illustrates the problem with that approach because there is no evidence in the record that the defendant's attorney explained the unanimity requirement to him. I would require a trial judge to inform a defendant that if he chooses to have his sentence determined by a jury, the death penalty can be imposed only if all 12 jurors agree that it should be and that if even one juror disagrees, the death penalty cannot be imposed.

I also dissent from the imposition of the death sentence for the reasons stated in my separate opinion in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting), based on my belief that the Illinois death penalty statute is unconstitutional and that the death sentence in this case should be vacated. See also *People v. Johnson* (1987), 119 Ill. 2d 119, 152-53 (Simon, J., concurring in part and dissenting in part), and authorities cited therein.