(No. 88474.█

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LAWRENCE JACKSON, Appellant.

*Opinion filed December 20, 2001.—Rehearing denied April 1, 2002.*

HARRISON, C.J., and KILBRIDE, J., dissenting.

Stephen E. Eberhardt, of Crestwood, and Eric J. Bell, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and

Renee Goldfarb and Linda Woloshin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Defendant, Lawrence Jackson, appeals from an order of the circuit court of Cook County dismissing his amended petition for post-conviction relief without an evidentiary hearing. Because defendant was sentenced to death for his underlying convictions, his appeal lies directly with this court. 134 Ill. 2d R. 651(a). For the reasons that follow, we affirm the dismissal of defendant's post-conviction petition.

## BACKGROUND

At a jury trial in the circuit court of Cook County, eight-year-old Urica Winder testified that defendant and codefendant Bobbie Driskel came to her family's apartment at 1850 West Washington late in the evening on September 24, 1986. The two men stabbed to death her mother, Vernita Winder, her four-year-old sister, Dana, her mother's boyfriend, Mark Brown, and her mother's friend, Shirley Martin, and then stole a television set and VCR. Urica, too, was brutally stabbed, but survived the attack by pretending to be dead.[1]

Based on Urica's testimony and other evidence, including defendant's own inculpatory statements to police, defendant was convicted on June 23, 1988, on four counts of first degree murder, one count of attempted murder, one count of aggravated battery of a child, five counts of home invasion, five counts of armed robbery, and one count of residential burglary. Following the convictions, a death penalty sentencing hearing was

---

[1]A detailed account of the murders can be found in the opinions issued by this court in defendant's direct appeals. See *People v. Jackson*, 145 Ill. 2d 43 (1991); *People v. Jackson*, 182 Ill. 2d 30 (1998).

held. The jury found defendant eligible for the death penalty and, after hearing evidence in aggravation and mitigation, found that the mitigation evidence did not preclude imposition of the death penalty. On September 7, 1988, the circuit court sentenced defendant to death, and imposed terms of imprisonment for the nonmurder convictions. This court affirmed the convictions and sentences on direct appeal. *People v. Jackson*, 145 Ill. 2d 43 (1991).

After our decision issued, defendant petitioned for a writ of *certiorari* with the United States Supreme Court. In response, the Supreme Court remanded the matter to this court for further consideration in light of *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222 (1992). See *Jackson v. Illinois*, 506 U.S. 802, 121 L. Ed. 2d 5, 113 S. Ct. 32 (1992). Thereafter, on September 26, 1991, this court issued a judgment affirming defendant's convictions and nondeath sentences. In accord with *Morgan*, however, defendant's death sentence was vacated and the cause remanded to the circuit court for a new death penalty sentencing hearing.

A new sentencing hearing was held and defendant again was found eligible for the death penalty based on three aggravating factors: multiple murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(3)); felony murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(6)), and murder of a child under the age of 12 when "the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty" (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(7)). The resentencing jury also determined that the mitigating evidence was insufficient to preclude imposition of the death penalty. Ill. Rev. Stat. 1987, ch. 38, par. 9—1(g). Therefore, on April 24, 1995, defendant was resentenced to death. On May 23, 1995, defendant filed a notice of appeal directly to this court.

On August 29, 1996, while the direct appeal was still

pending, defendant filed a *pro se* post-conviction petition, challenging the effectiveness of his trial and appellate counsel and the fairness of his death penalty sentencing hearing. Upon receipt of the petition, the circuit court appointed the office of the State Appellate Defender to represent defendant. Nothing further was filed, however, until this court issued an opinion on defendant's direct appeal, affirming the imposition of the death penalty upon resentencing. *People v. Jackson*, 182 Ill. 2d 30 (1998). Thereafter, on March 12, 1999, with the assistance of counsel, defendant filed an amended post-conviction petition, raising 14 claims. A fifteenth claim was added later.

Upon the State's motion, the trial court dismissed defendant's petition without an evidentiary hearing. Because this is a capital case, defendant seeks review of the dismissal of his post-conviction petition by this court. 134 Ill. 2d R. 651(a). Before this court, defendant asks that an evidentiary hearing be held on the following nine claims: (1) whether he was denied effective assistance of counsel at resentencing because his attorney failed to investigate and present evidence of a family history of mental illness; (2) whether he was denied effective assistance of counsel because his appellate attorney failed to argue on direct appeal that he was denied a fair sentencing hearing due to the introduction of victim impact evidence concerning unrelated offenses; (3) whether his constitutional rights were violated when the State used peremptory challenges to excuse prospective jurors who expressed reservations about the death penalty; (4) whether he was denied a fair sentencing hearing due to (a) judicial bias, (b) the presentation of hypnotically enhanced testimony, and (c) erroneous rulings; (5) whether the death penalty is an appropriate sentence in this case; (6) whether the court questioned prospective jurors in a manner which suggested that the

jury would have to find unanimously that mitigation evidence outweighed aggravation evidence; (7) whether a new sentencing hearing is required because of the cumulative effect of all of the constitutional violations alleged above; (8) whether the death penalty statute is unconstitutional because it has no burden of persuasion; and (9) whether the death penalty statute is unconstitutionally discriminatory, arbitrary and capricious because it precludes the imposition of death in cases where an individual requires "special forms of communicative assistance" at trial.

The evidence presented at defendant's second death penalty hearing is presented in detail in our opinion on defendant's direct appeal and will not be recounted here. We will discuss only those facts necessary to the disposition of this appeal.

## ANALYSIS

The Post-Conviction Hearing Act (the Act) (725 ILCS 5/122—1 *et seq.* (West 2000)) is a statutory vehicle which provides criminal defendants with an opportunity to obtain relief from substantial violations of their federal or state constitutional rights that occurred at trial or sentencing. *People v. Towns*, 182 Ill. 2d 491, 502 (1998). A petition filed under the Act is not an appeal, but a collateral attack on the judgment of conviction or sentence. *People v. Edwards*, 195 Ill. 2d 142 (2001); *People v. Williams*, 186 Ill. 2d 55, 62 (1999). Consequently, the purpose of a post-conviction proceeding is not to determine guilt or innocence, but to inquire into constitutional issues which have not been, and could not have been, previously adjudicated. *People v. Griffin*, 178 Ill. 2d 65, 72-73 (1997); *People v. Eddmonds*, 143 Ill. 2d 501 (1991). Matters that were raised and decided on direct appeal are *res judicata*, and matters that could have been raised on appeal, but were not, will ordinarily be deemed waived. *People v. McNeal*, 194 Ill. 2d 135 (2000); *People v. West*, 187 Ill. 2d 418, 425 (1999).

In a capital case, once a post-conviction petition is filed, the circuit court has 90 days in which to examine the petition and, if the petitioner is without counsel or the means to procure counsel, appoint counsel for him. 725 ILCS 5/122—2.1(a)(1) (West 2000). The petition is then docketed for further consideration and the State must "answer or move to dismiss." 725 ILCS 5/122—5 (West 2000). If the State seeks dismissal of the petition, the circuit court must rule on the sufficiency of the allegations, without engaging in any fact-finding and taking all well-pleaded facts as true. *People v. Coleman*, 183 Ill. 2d 366, 388 (1998). Unless the circuit court finds that the allegations in the post-conviction petition, supported where appropriate by the trial record or accompanying affidavits, make a substantial showing that the defendant's constitutional rights have been violated, the petition may be dismissed without an evidentiary hearing. *People v. West*, 187 Ill. 2d 418, 425 (1999); *Coleman*, 183 Ill. 2d at 381; *People v. Pecoraro*, 175 Ill. 2d 294, 304 (1997). A petitioner is not entitled to an evidentiary hearing as of right. *Griffin*, 178 Ill. 2d at 73.

A circuit court's ruling on the sufficiency of the allegations contained in a post-conviction petition is a legal determination. *Coleman*, 183 Ill. 2d at 388. We review *de novo* a post-conviction petition that has been dismissed without an evidentiary hearing. *People v. Edwards*, 195 Ill. 2d 142 (2001); *Coleman*, 183 Ill. 2d at 389.

With these principles in mind, we address defendant's claims in the order that they were raised.

### I. Ineffective Assistance of Counsel

In his first two claims, defendant contends that he received ineffective assistance of counsel, first at his resentencing hearing and then when his death sentence was appealed directly to this court. The right to effective assistance of counsel, guaranteed by our federal and state constitutions (U.S. Const., amends. VI, XIV; Ill. Const.

1970, art. I, § 8), applies to appellate and sentencing proceedings, as well as trial proceedings, and violations of this right are cognizable under the Post-Conviction Hearing Act. *People v. Simms*, 192 Ill. 2d 348, 361 (2000).

Claims of ineffective assistance of counsel are governed by the familiar *Strickland* standard, which is composed of two prongs: deficiency and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). To establish the deficiency prong, defendant must show that his counsel's performance, objectively measured against prevailing professional norms, was so deficient that counsel was not functioning as the "counsel" guaranteed by the sixth amendment. *People v. Easley*, 192 Ill. 2d 307, 317 (2000); *People v. Hampton*, 149 Ill. 2d 71, 108-09 (1992). Defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy. *People v. Evans*, 186 Ill. 2d 83, 93 (1999); *People v. Griffin*, 178 Ill. 2d 65, 73-74 (1997).

To establish the prejudice prong, defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Evans*, 186 Ill. 2d at 93; *Griffin*, 178 Ill. 2d at 74. However, the prejudice prong of *Strickland* is not simply an "outcome-determinative" test but, rather, may be satisfied if defendant can show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *Simms*, 192 Ill. 2d at 362.

In the case at bar, defendant first claims that he received ineffective assistance of counsel at his capital resentencing hearing. Defendant contends that his attorneys conducted a "superficial" investigation and, as a result, failed to discover and present to the sentencing jury evidence that defendant's family has an extensive

history of mental illness. In support of this claim, defendant attached to his amended post-conviction petition a 39-page amended mitigation report by forensic social worker Alice Washington. Washington's report, supported by the affidavits of several of defendant's family members, reveals that mental illness has affected several generations on both sides of defendant's family. At least 13 members of defendant's family, including one sibling, aunts and uncles, and several cousins, have been diagnosed as suffering from mental illness, predominantly paranoid schizophrenia, which has in some instances been accompanied by episodes of extreme violence. In further support of his claim, defendant also attached to his petition a five-page neuropsychological assessment prepared by developmental psychologist Dr. James Garbarino and a one-page letter from psychiatrist Dr. Henry Conroe. It is defendant's position that the allegations in his claim, supported by the documents which he attached to his petition, make a substantial showing that his resentencing counsel's failure to present evidence of his family history of mental illness constitutes ineffective assistance of counsel and that an evidentiary hearing is necessary to determine whether his constitutional rights were violated. We disagree.

In the context of a second-stage capital sentencing hearing, the *Strickland* standard for proving ineffective assistance of counsel requires a defendant to show "(1) that his attorney's performance at the sentencing hearing did not constitute reasonably effective assistance, judged by prevailing professional norms (*Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065), and (2) there is reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating factors did not warrant death (*Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069)." *People v. Johnson*, 183 Ill. 2d

176, 195-96 (1998); see also *People v. Mitchell*, 189 Ill. 2d 312 (2000). Counsel has an obligation to conduct a reasonable investigation into potential sources of mitigating evidence to present at the capital sentencing hearing, or must have a legitimate reason for failing to make a particular investigation. *People v. Towns*, 182 Ill. 2d 491, 510 (1998); *Griffin*, 178 Ill. 2d at 86. However, if an adequate investigation was conducted, counsel will not be deemed ineffective merely because a particular item of evidence was not introduced. *Towns*, 182 Ill. 2d at 510; *Griffin*, 178 Ill. 2d at 86.

In the present case, defendant cannot satisfy either prong of the *Strickland* test. As to the first prong— deficiency—the record does not support defendant's claim that the investigation into potential sources of mitigating evidence was inadequate, nor does it show that counsel was deficient for having failed to uncover evidence of a family history of mental illness. Defendant's attempts to draw a comparison between this case and *People v. Towns*, 182 Ill. 2d 491 (1998), are unavailing.

In *Towns*, the record showed that counsel conducted no investigation into mitigating evidence and, instead, relied solely on a pretrial sanity report. In the present case, however, a review of the record reveals that the resentencing defense attorneys employed the services of mitigation specialist Alvin Hill. Although Hill did not testify at the resentencing hearing, he prepared a lengthy mitigation report after interviewing the defendant and at least 10 other persons. Due in part to Hill's extensive investigations, the defense team was able to present mitigation evidence at the second sentencing hearing which had been unavailable at the first sentencing hearing. For instance, family members who earlier had been unwilling to testify or whose testimony at the first sentencing hearing failed to include family background came forward at the resentencing hearing and revealed,

for the first time, the nature of defendant's life during his formative years. Through the testimony of witnesses such as Alicia Jackson, Donald Jackson, and George Rowe, Jr., the resentencing jury learned that defendant led an impoverished childhood which was chaotic, turbulent, and punctuated by frequent episodes of extreme abuse and neglect. These witnesses explained that defendant's natural father abandoned the family when defendant was young, leaving him and his siblings to be raised by an alcoholic mother and her abusive boyfriends. As a child, defendant also witnessed several disturbing incidents of violence, including his brother being struck and killed by a car.

In addition to this newly discovered family background evidence, defendant's attorneys introduced new evidence that defendant exhibited abnormal brain functioning, which was likely a result of head injuries defendant had suffered. Dr. Michael Gelbort, a clinical psychologist with a specialty in neuropsychology, testified that he examined defendant and performed numerous tests, including intelligence tests, which allowed him to assess various aspects of defendant's brain functioning. From these tests, Dr. Gelbort concluded that defendant suffered from organic brain dysfunction with cognitive abnormalities. The abnormalities seemed to be most severe in the frontal lobes of the brain, which control problem-solving and reasoning ability. According to Dr. Gelbort, the frontal lobes operate as the "gas pedal" and "brake pedal" of behavior—allowing a person to initiate appropriate behavior and preventing a person from acting inappropriately. The abnormalities to defendant's frontal lobes suggested that defendant's judgment as to appropriate behavior would be impaired.

By comparing the evidence presented at defendant's first sentencing hearing with the evidence presented at resentencing, it is clear that the attorneys who assisted

defendant at his resentencing conducted a reasonable investigation into potential sources of mitigating evidence. Neither the investigation, nor the presentation of mitigation evidence at defendant's resentencing, was superficial.

Moreover, there is good reason why defense counsel failed to uncover and present evidence of defendant's family history of mental illness. In an affidavit dated March 10, 1999, and submitted by the defense in support of defendant's post-conviction petition, mitigation specialist Alice Washington stated, "That at the time of the initial sentencing hearing, and those subsequent thereof, [*sic*] no one had knowledge of the family history of mental illness because it was the family's dark secret." According to Washington, defendant's family, apparently due to embarrassment, had been disinclined to reveal information regarding the family's widespread affliction with mental illness. In a previous affidavit dated January 21, 1999, Washington stated, "It has been a very difficult task trying to convince [defendant's] family that the family history of mental illness needs to be explored and presented to the court."

We conclude that the failure to discover the family history of mental illness cannot be attributed to any deficiency of counsel. Defendant's family withheld this information due to a desire to keep this "family secret" private. Consequently, defendant has failed to satisfy the deficiency prong of the *Strickland* test. In light of the record in this case, defendant has not made a substantial showing that his counsel was deficient because evidence of a family history of mental illness was not discovered or presented at his resentencing hearing.

Having made this determination, it is not necessary to consider the prejudice prong of the *Strickland* test. Nevertheless, it is clear to this court that defendant cannot make a substantial showing of prejudice and,

consequently, the lack of prejudice is an additional reason for finding that defendant's ineffective assistance of counsel claim was properly dismissed without an evidentiary hearing.

To show prejudice, defendant must be able to show a reasonable probability that, had evidence of his family history of mental illness been presented, the sentencing jury would have concluded that the balance of aggravating and mitigating factors would not warrant death. Defendant cannot meet this standard, however, because no correlation has been shown between the history of mental illness in defendant's family and his own mental condition.

Experts who examined defendant in 1987 and 1988, prior to defendant's first trial and sentencing, found that defendant did not suffer from a mental illness. Dr. Ziporyn, a psychiatrist called by the defense, diagnosed defendant as having a passive-aggressive personality disorder and testified that "at the time I examined [defendant] there were no marked or major mental issues." Dr. Ziporyn's findings were confirmed by Dr. Reifman, the director of the Psychiatric Institute of the circuit court of Cook County, who was called by the State at trial. Based on the results of psychological testing and his own observations of defendant, Dr. Reifman diagnosed defendant as having a mixed personality disorder with antisocial passive-aggressive tendencies, influenced by drug abuse. Dr. Reifman found defendant to be "oriented, relevant, coherent, logical" and concluded that defendant was not suffering from a mental disease, defect, or mental condition.

These experts have not been contradicted by anything in defendant's post-conviction petition or the documents attached to the petition. The report prepared by mitigation specialist Alice Washington suggests that the high incidence of paranoid schizophrenia in defendant's fam-

ily raises "a reasonable question as to whether or not [defendant] suffers from the same mental illness which has afflicted his relatives." But Washington is only speculating and her speculation is not evidence which can defeat the earlier expert testimony that defendant does not suffer from mental illness or defect.

Furthermore, this court is unable to discern from any of the documents attached to defendant's post-conviction petition how defendant's family history of mental illness mitigates his criminal behavior in this case. Dr. James Garbarino states in his five-page report: "The mental illness evident in [defendant's] family and the cognitive limitations noted in the various reports would tend to contribute to the problems [defendant] would face in drawing appropriate conclusions from social realities." Thus, according to Dr. Garbarino, defendant's family history of mental illness may have some tangential relevance to defendant's ability to draw "appropriate conclusions from social realities." To the extent that this is true, however, it is cumulative of the evidence already heard by the resentencing jury from Dr. Gelbort, who testified that defendant's organic brain dysfunction impaired his ability to make appropriate behavior choices. We are unpersuaded that there is a reasonable probability that defendant's sentencing jury, after considering Dr. Garbarino's report and other evidence of defendant's family history of mental illness, would conclude the balance of aggravating and mitigating factors would not warrant a death sentence.

Nor is this conclusion altered by the letter from Dr. Henry Conroe. Dr. Conroe, it appears, examined defendant on February 17, 1988, prior to defendant's initial trial and sentencing. In a letter, dated May 15, 1999, and attached to the post-conviction petition, Dr. Conroe writes:

"At the time that I examined [defendant] on 2/17/88, I did not have access to information about his family, his grow-

ing up, the history of physical and mental abuse, his history of head injuries, and neuropsychological testing. After being provided this information, I conclude that if this evidence were made available to me initially, my assessment of him would have been different. Beyond the diagnoses of Substance Abuse and a Mixed Personality Disorder with Anti-social and Passive Aggressive features, I would have focused on the effects of his family history, his early environment and the 'diffuse neurocognitive dysfunction' described in Dr. Michael Gelbort's report on the defendant's behavior at the time of the crime."

Significantly, Dr. Conroe does not modify his opinion that defendant suffers from a personality disorder rather than a mental illness. Moreover, Dr. Conroe does not focus on the mental illness of defendant's family as the basis for changing his assessment of defendant. Rather, he states that his opinion of defendant would have been influenced by the spectrum of "information about his family, his growing up, the history of physical and mental abuse, his history of head injuries, and neuropsychological testing." Of particular interest to Dr. Conroe was the evidence of defendant's "diffuse neurocognitive dysfunction" described by Dr. Gelbort. All of the evidence which Dr. Conroe found meaningful had been presented to and considered by the resentencing jury.

Finally, defendant cannot show prejudice because defendant's family history of mental illness is not inherently mitigating and could be interpreted as aggravating. See *People v. Montgomery*, 192 Ill. 2d 642, 673 (2000); *People v. Evans*, 186 Ill. 2d 83, 101 (1999). Washington's 39-page report indicates that some of defendant's family members who suffer from paranoid schizophrenia have committed serious criminal acts. Two relatives were in mental institutions after being found not guilty by reason of insanity, one for first degree murder and the other for armed robbery. Another family member was reputed to have killed a child and thrown the body into Lake Michigan. Thus, the family history evidence could sug-

gest defendant's future dangerousness—a factor which may be considered in aggravation. *Evans*, 186 Ill. 2d at 101; *People v. Kidd*, 175 Ill. 2d 1, 51 (1996); *People v. Mahaffey*, 165 Ill. 2d 445, 467 (1995); *People v. Ward*, 154 Ill. 2d 272, 335-37 (1992).

In sum, we conclude that defendant has failed to make a substantial showing that his resentencing counsel was deficient or that he was prejudiced by any perceived deficiencies of counsel. Consequently, the claim that he received ineffective assistance of counsel at resentencing was properly dismissed without an evidentiary hearing.

Defendant next claims he received ineffective assistance of appellate counsel when he appealed to this court after his resentencing hearing. When determining whether defendant has made a substantial showing that his constitutional rights have been violated by appellate counsel's incompetence, we again employ the *Strickland* test. *People v. West*, 187 Ill. 2d 418, 435 (1999). To succeed on a claim of ineffective assistance of appellate counsel, defendant must show that the failure to raise a particular issue was objectively unreasonable and that the decision prejudiced the defendant. *People v. Smith*, 195 Ill. 2d 179 (2000). "Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong. Accordingly, unless the underlying issues are meritorious, defendant has suffered no prejudice from counsel's failure to raise them on appeal." *People v. Easley*, 192 Ill. 2d 307, 328-29 (2000).

In the case at bar, defendant contends that his appellate counsel was incompetent because he failed to raise on appeal the improper admission of victim impact evidence for unrelated offenses, which was found to be error in *People v. Hope*, 184 Ill. 2d 39 (1998).

In *Hope*, the defendant was convicted for the February 5, 1982, murder of a police officer on a CTA bus. During the eligibility phase of the defendant's capital sentencing hearing, the State presented evidence that the defendant also had been convicted for the January 11, 1982, murder of a security guard at a McDonald's restaurant. Later, at the aggravation/mitigation stage of the sentencing proceedings, the State introduced victim impact statements from victims of the McDonald's shooting. This court held:

"[The Rights of Crime Victims and Witnesses Act (725 ILCS 120/1 *et seq*. (West 1994))] does not contemplate, and we will not condone, an expansion of victim impact statements to include evidence from victims other than the victims of the offense on trial." *Hope*, 184 Ill. 2d at 49.

Later, this court went on to hold:

"While the details of prior crimes are considered relevant aggravation because they illuminate the character and record of a capital defendant (see *People v. Edgeston*, 157 Ill. 2d 201, 235-37 (1993)), the unforeseen effects of those prior crimes on their victims are of no such assistance. *** [V]ictim impact statements regarding [an unrelated] offense are simply too attenuated to be relevant." *Hope*, 184 Ill. 2d at 52.

Thus, *Hope* stands for the proposition that victim impact statements, submitted pursuant to the Rights of Crime Victims and Witnesses Act and which detail the effects that an unrelated, collateral offense has had on a victim or victim's family, are inadmissible at a second-stage capital sentencing hearing.

In the case at bar, defendant identifies two witnesses as the sources of improper victim impact evidence—Officer Kelly Byrne and Dr. Demetra Soter. However, neither Officer Byrne nor Dr. Soter gave a "victim impact statement," as that term is defined in the Rights of Crime Victims and Witnesses Act (725 ILCS 120/1 *et seq*. (West 2000). The Act states:

"In any case where a defendant has been convicted of a

violent crime or a juvenile has been adjudicated a delinquent for a violent crime except those in which both parties have agreed to the imposition of a specific sentence, and a victim of the violent crime is present in the courtroom at the time of the sentencing or the disposition hearing, the victim upon his or her request shall have the right to address the court regarding the impact which the defendant's criminal conduct or the juvenile's delinquent conduct has had upon the victim. *If the victim chooses to exercise this right, the impact statement must have been prepared in writing in conjunction with the Office of the State's Attorney prior to the initial hearing or sentencing, before it can be presented orally or in writing at the sentencing hearing.* In conjunction with the Office of the State's Attorney, a victim impact statement that is presented orally may be done so by the victim or his or her representative." (Emphasis added.) 725 ILCS 120/6(a) (West 2000).

In the present case, Officer Byrne, a correctional officer with the Cook County sheriff's department, was called to testify by the State in aggravation. She testified that, between 1985 and 1986, she worked the midnight shift at Division 2 of the county jail, where defendant was incarcerated after being convicted on a burglary charge. On January 21, 1986, Officer Byrne filed a disciplinary report against defendant and, as a result, defendant was confined to segregation for two to three days. When defendant returned to Division 2, he began a campaign of intimidation against Officer Byrne and, as his release date approached, began making verbal threats to her. On one occasion, defendant told Officer Byrne, "I will get you. I will find you, and I will get you." On another occasion, defendant came up behind Officer Byrne in the hallway and asked, in a threatening tone, how her little girl was doing. At the time Officer Byrne had an 18-month-old daughter, but she did not know how defendant had obtained this information.

Defendant admits that Byrne's testimony, up to this point, was properly admitted. The offending "victim

impact" testimony of which he complains consists of a single answer to a question posed by the State, which the court allowed over defendant's objection:

"Q. [prosecutor] Ms. Byrne, tell the Ladies and Gentlemen of the jury how you changed your conduct upon the release of [defendant] from Cook County Jail?

A. [Officer Byrne] Prior to my incident with [defendant], I very seldom carried an off-duty weapon. After his release, I carried one consistently. I also changed my route home from work every day. When I get [sic] off in the morning, I took a different route home.

As I said I was working midnight, and I had a retired woman that would stay at my house during the night to babysit, and I instructed her to know where my off-duty weapon was and make sure she knew how to use it if it would be necessary."

As stated, Officer Byrne's testimony was not a formal victim impact statement presented pursuant to the Rights of Crime Victims and Witnesses Act. Nor do we construe Officer Byrne's testimony as victim impact evidence. The remarks made by Officer Byrne contain none of the typical elements of victim impact evidence. She does not describe any physical, psychological, or financial difficulties experienced by her or her family as a result of a crime perpetrated on her by the defendant. Rather, Officer Byrne's testimony regarding her altered conduct simply informed the jury that she had taken defendant's threats seriously.

We also find no merit to defendant's argument that Dr. Soter presented victim impact evidence in violation of *Hope*. Dr. Soter was Urica Winder's treating physician. He was called by the State to testify regarding Urica's wounds, the subsequent surgical procedures she endured, and the possible long-term effects of the injuries on Urica's physical and emotional well-being. In a vain attempt to characterize the attack on Urica as an "unrelated offense," defendant points out that the evidence indicated

that codefendant Bobbie Driskel, and not defendant, inflicted Urica's wounds.

The fact that defendant did not wield the knife which caused Urica's injuries does not make her attack an unrelated offense. The attack on Urica was part of the entire incident which resulted in the murders for which defendant was being sentenced. Thus, not only is defendant legally accountable for Urica's injuries, her injuries reflect on defendant's moral character. While defendant may not have inflicted Urica's injuries, neither did he take steps to prevent the attack. Rather, his behavior at the time of the incident suggests that he tacitly approved of the attack on her. Thus, the concern in *Hope*, that the victim impact evidence would be too attenuated to be relevant to the sentencing jurors' inquiry into the defendant's character and record, is not present here.

Because defendant has been unsuccessful in his attempt to show that the testimony of Officer Byrne and Dr. Soter was unrelated victim impact evidence admitted in violation of *Hope*, it follows that appellate counsel could not have been deficient for failing to raise this issue on direct appeal. Furthermore, because defendant has not made a substantial showing that he received ineffective assistance of counsel, the claim was properly dismissed without an evidentiary hearing.

## II. *Witherspoon* Violation

Defendant contends that he was denied his constitutional right to an impartial jury and his "due process right to a jury from which no jurors have been systematically removed." The basis for this claim is the State's use of peremptory challenges to remove from the venire individuals who expressed reservations about imposing the death penalty. In particular, defendant claims that the State excused Dale Larsen, Albert Efkman, and James Lofgren based on a perception that they were

"weak as far as the death penalty" and, thus, the State "seated a hanging jury" by removing these men who were "otherwise well qualified" to sit on the jury.

Under *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), and its progeny, it is unconstitutional to remove *for cause* a prospective juror who expresses a general objection to the death penalty on moral or religious grounds. This court has repeatedly held, however, that *Witherspoon* does not limit the State's use of peremptory challenges. *People v. Coleman*, 168 Ill. 2d 509, 549 (1995); *People v. Williams*, 161 Ill. 2d 1, 55-56 (1994); *People v. Howard*, 147 Ill. 2d 103, 136-38 (1991). While defendant acknowledges these decisions, he urges us to reconsider them. Yet, he has provided this court with no persuasive reasons for departing from our earlier holdings.

But even if this court were inclined to revisit this issue, it would be unnecessary in this case. Defendant contends the State unconstitutionally exercised its peremptory challenges to exclude Dale Larsen, Albert Efkman, and James Lofgren. However, these men were members of the venire at defendant's first sentencing hearing. The death sentence which was imposed following the first sentencing hearing was vacated. Defendant received a new sentencing hearing, where the evidence was heard by an entirely new sentencing jury. Thus, whether the State improperly excluded these venirepersons is a moot issue, which we need not consider. See *People v. Henderson*, 142 Ill. 2d 258, 281 (1990).

Defendant does not contend that any venire members at his second sentencing hearing were improperly excluded. Accordingly, we conclude that defendant has failed to make a substantial showing that his constitutional rights to an impartial sentencing jury were violated. This claim was properly dismissed without an evidentiary hearing.

III. Fairness of the Sentencing Hearing

Defendant next claims that his due process and equal protection rights were violated because his sentencing hearing was fundamentally unfair. In particular, he contends that (a) the judge who presided over his sentencing hearing was biased, (b) inadmissible "hypnotically enhanced" testimony was presented, and (c) under the heading of "other claims," eight additional errors denied him a fair sentencing hearing.

(a) *Judicial Bias*

Defendant attached to his post-conviction petition two affidavits in support of his claim that the judge who presided over his sentencing hearing was biased against him. The first affiant was Martha Fitzsimmons, an attorney employed by the Cook County public defender's office, who represented defendant at his second sentencing hearing. Fitzsimmons attested to the fact that she had visited the judge's chambers and saw "prominently displayed on the wall, a framed and matted souvenir." Fitzsimmons said she later learned that this "souvenir" had been given to the judge by the assistant State's Attorneys who had originally tried defendant's case. The framed "souvenir" held a picture of two girls—Urica Winder and her sister—and a handwritten letter from Urica. According to Fitzsimmons, the letter said "something to the effect of ... thank you Judge Urso for helping me during the trial and putting those bad men away for good." Fitzsimmons stated that she informed appellate counsel of this "evidence of prejudice," but that the issue of judicial bias was not raised on appeal.

The second affiant was Steven Clark, an attorney employed by the office of the State Appellate Defender and defendant's counsel for both of defendant's direct appeals to this court and for his appeal to the United States Supreme Court. Clark averred that he had been present in the courtroom on several occasions during defendant's second death penalty hearing and

"on 5 to 10 occasions during the proceedings, in the presence of the jury, Judge Urso reacted to objections and requests for side bars by defense counsel by at various times frowning, raising the volume of his voice, rolling his eyes, looking at the ceiling, or abruptly moving his arms or body. Each of these reactions indicated that the Judge was angry with defense counsel."

As stated, a post-conviction petition is not an appeal, but a collateral proceeding, and issues that could have been presented on direct appeal, but were not, may be deemed waived. *People v. Hampton*, 165 Ill. 2d 472 (1995); *People v. Stewart*, 123 Ill. 2d 368, 372 (1988). Waiver will apply unless principles of fundamental fairness require review of the issue. *People v. Owens*, 129 Ill. 2d 303, 317 (1989). " ' "Fundamental fairness" requires courts to review procedurally defaulted claims in collateral proceedings only when a defendant shows cognizable "cause" for his failure to make timely objection, and shows "actual prejudice" flowing from the error now complained of.' " *People v. Hudson*, 195 Ill. 2d 117, 123 (2001), quoting *Owens*, 129 Ill. 2d at 317, citing *Wainwright v. Sykes*, 433 U.S. 72, 53 L. Ed. 2d 594, 97 S. Ct. 2497 (1977). See also *People v. Mahaffey*, 194 Ill. 2d 154 (2000). As detailed in *Hudson*:

" '[C]ause' denotes ' " 'some objective factor external to the defense [that] impeded counsel's efforts' to raise the claim" in an earlier proceeding.' *People v. Flores*, 153 Ill. 2d 264, 279 (1992), quoting *McCleskey v. Zant*, 499 U.S. 467, 493, 113 L. Ed. 2d 517, 544, 111 S. Ct. 1454, 1470 (1991), quoting *Murray v. Carrier*, 477 U.S. 478, 488, 91 L. Ed. 2d 397, 408, 106 S. Ct. 2639, 2645 (1986). Moreover, the United States Supreme Court has identified objective factors that constitute cause to include ' " 'interference by officials' " that makes compliance with the State's procedural rule impracticable, and "a showing that the factual or legal basis for a claim was not reasonably available to counsel." [Citation.] In addition, constitutionally "[i]neffective assistance of counsel ... is cause." [Citation.] Attorney error short of ineffective assistance of counsel,

however, does not constitute cause \*\*\*.' *McCleskey*, 499 U.S. at 493-94, 113 L. Ed. 2d at 544, 111 S. Ct. at 1470. To establish actual prejudice, a petitioner 'must show "not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." ' *Murray*, 477 U.S. at 494, 91 L. Ed. 2d at 412, 106 S. Ct. at 2648, quoting *United States v. Frady*, 456 U.S. 152, 170, 71 L. Ed. 2d 816, 832, 102 S. Ct. 1584, 1596 (1982)." *Hudson*, 195 Ill. 2d at 123-24.

In the present case, judicial bias was not raised in defendant's direct appeal. While we acknowledge that the waiver rule is less rigidly applied where the basis for the objection is the conduct of the trial judge (*People v. Nevitt*, 135 Ill. 2d 423, 455 (1990)), principles of fundamental fairness do not require that we ignore the procedural bar in this case.

Although defendant fails to mention it, a substitution of judge motion was filed prior to defendant's resentencing hearing. In this motion, allegations of Judge Urso's lack of impartiality were premised, primarily, on the framed photograph and letter from Urica which Judge Urso kept in his chambers. The motion was heard by Judge Gaughan, who held an evidentiary hearing on the matter. At this hearing, the court heard testimony which established that the framed letter stated simply, "Judge Urso, Thank you. Urica." Furthermore, other witnesses testified that this framed keepsake was only one of many pictures, artists' sketches, and pieces of memorabilia which cluttered the judge's chambers. After hearing argument on the motion, Judge Gaughan denied the substitution motion.

When Clark represented defendant in his direct appeal following the resentencing, he did not challenge the correctness of this ruling. Nor did Clark raise judicial bias as an issue on appeal, even though Clark now claims to have witnessed the judge exhibiting body language

during the sentencing hearing which suggested that the judge was not being impartial.

Under the circumstances, the claim of judicial bias which is being raised in the post-conviction petition is not based on "new evidence" unknown to appellate counsel, nor can defendant show that efforts to raise the issue of judicial bias in a timely fashion were impeded. Thus, he cannot show cognizable cause.

Moreover, defendant cannot show a reasonable possibility that he was prejudiced as a result of judicial bias. The trial court, after an evidentiary hearing, decided that the framed keepsake was not a basis for disqualifying Judge Urso from presiding over the sentencing hearing. We agree.

Disqualification of a judge is not a decision to be made lightly. *People v. Steidl*, 177 Ill. 2d 239 (1997); *People v. Vance*, 76 Ill. 2d 171 (1979). A judge is presumed to be impartial even after extreme provocation. *People v. Hall*, 114 Ill. 2d 376, 407 (1986). It is assumed that judges, regardless of their personal backgrounds and experiences in life, will be able to set aside any biases or predispositions they might have and consider each case in light of the evidence presented. *People v. Tye*, 141 Ill. 2d 1 (1990). "[O]nly under the most extreme cases would disqualification for bias or prejudice be constitutionally required." *People v. Coleman*, 168 Ill. 2d 509, 541 (1995); *People v. Del Vecchio*, 129 Ill. 2d 265, 275 (1989).

The "thank you" note and picture were apparently given to Judge Urso soon after defendant's initial trial, which took place in 1988. There is no evidence that Judge Urso had any contact with Urica closer in time to the resentencing hearing, which took place years later. Under the circumstances, the keepsake is not evidence that Judge Urso could not remain impartial in the subsequent resentencing hearing.

Clark's affidavit is equally unpersuasive in demon-

strating judicial bias. Allegations of judicial bias must be viewed in context and should be evaluated in terms of the trial judge's specific reaction to the events taking place. See *People v. Hannon*, 48 Ill. 2d 462 (1971) (when evaluating bias based upon a judge's comment, reviewing court will review entire context of comment); *People v. Martin*, 285 Ill. App. 3d 623 (1996). Here, this court is unable to consider the judge's reactions in context because Clark's affidavit fails to identify the location in the record where Judge Urso's reactions allegedly took place. Moreover, the fact that Judge Urso may have displayed irritation with defense counsel is not necessarily evidence of judicial bias against defendant. See *People v. Steidl*, 177 Ill. 2d 239 (1997) (a judge's displeasure with counsel's behavior is not a basis for automatic recusal). Nothing that has been presented to this court suggests that Judge Urso was unable to "hold the balance nice, clear and true between the State and the accused." See *People v. Del Vecchio*, 129 Ill. 2d 265, 275 (1989), citing *Tumey v. Ohio*, 273 U.S. 510, 532, 71 L. Ed. 749, 758, 47 S. Ct. 437, 444 (1927). Since principles of fundamental fairness do not require a relaxation of the procedural bar, the issue of judicial bias is waived.

(b) *Hypnotically Enhanced Testimony*

Defendant next contends that he is entitled to an evidentiary hearing to determine whether he was denied a fair resentencing hearing because "hypnotically enhanced" testimony was introduced through Urica Winder. An evidentiary hearing is warranted, however, only when the allegations in the petition, supported where appropriate by the trial record or accompanying affidavits, make a substantial showing that the defendant's constitutional rights have been violated. *People v. Smith*, 195 Ill. 2d 179 (2000); *People v. Hobley*, 182 Ill. 2d 404, 427-28 (1998). In the case at bar the record and supporting documents do not support a finding that Urica Winder's testimony was "hypnotically enhanced."

Defendant relies on a July 10, 1988, Chicago Tribune article as evidence that "dream analysis" may have been used on Urica. However, the article contains only Dr. Soter's recollection of a dream that Urica once told him about. Dr. Soter was Urica's treating physician and he provided no psychological counseling or therapy. The article is not evidence that hypnosis or "dream analysis" were techniques employed in any therapy Urica might have received.

Furthermore, the record does not support defendant's assertion that Urica's testimony "evolved and became more detailed over the course of time." Our review of the record indicates that Urica was consistent in her testimony throughout all of the proceedings. We conclude that defendant's claim that the State employed Urica's "artificially enhanced" testimony at his sentencing hearing is speculative and does not rise to the level of a substantial showing of a constitutional violation.

### (c) *Other Claims*

Defendant presents, in list form, eight additional claims of error. However, his argument is directed only to his eighth claim, in which he contends that his constitutional rights were violated because he was denied the right of allocution at his resentencing.

On several occasions, this court has held that a defendant has no statutory or constitutional right to allocution in a capital sentencing hearing. *People v. Hall*, 195 Ill. 2d 1 (2000); *People v. Simms*, 192 Ill. 2d 348 (2000); *People v. Gilliam*, 172 Ill. 2d 484 (1996). As to the remaining claims, we decline to address them. Our rules provide that an appellant's brief must contain "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on" and "[p]oints not argued are waived." 177 Ill. 2d R. 341(e)(7). Consequently, the remaining claims of error are waived.

Because defendant has failed to make a substantial showing that his constitutional right to a fair sentencing hearing was violated, we find that the trial court properly dismissed these claims without an evidentiary hearing.

### IV. Appropriateness of the Death Penalty

It is defendant's contention that death is not an appropriate penalty in this case. He argues that, "when proper consideration is given to the circumstances of the crime in this case, as well as to [defendant's] life history, it is evident that he is not the type of person who should be permanently eliminated from society." Noting that his codefendant received a natural life sentence, defendant asks this court to vacate his death sentence and remand for a sentence other than death.

Clearly, the legislature never intended that every defendant who is eligible for the death penalty receive a death sentence (*People v. Blackwell*, 171 Ill. 2d 338 (1996)), and this court has not hesitated to vacate a death sentence where the circumstances did not indicate that death was an appropriate sentence (see *People v. Leger*, 149 Ill. 2d 355 (1992); *People v. Johnson*, 128 Ill. 2d 253 (1989); *People v. Buggs*, 112 Ill. 2d 284 (1986); *People v. Gleckler*, 82 Ill. 2d 145 (1980)). However, whether a death sentence is excessive or inappropriate depends on the facts and circumstances of the case (*People v. Tye*, 141 Ill. 2d 1, 26-27 (1990)), and we cannot say, based on our review of the record, that a death sentence is excessive or inappropriate in this case.

The horrific facts of this case have been detailed in defendant's two direct appeals. See *People v. Jackson*, 145 Ill. 2d 43 (1991); *People v. Jackson*, 182 Ill. 2d 30 (1998). Briefly, however, the record reveals that defendant and his friend, Driskel, while under the influence of drugs and alcohol, went to the apartment of an acquaintance (Mark Brown) after devising a plan to steal Brown's belongings, which they intended to sell to obtain money

for more drugs. Before entering Brown's apartment, defendant gave Driskel a knife and, upon entering the apartment, they began stabbing Mark Brown, without provocation or warning, as Brown lay asleep on the couch. When Brown's fiancée, Vernita Winder, saw what was happening, she tried to escape with her four-year-old and six-year-old daughters to a back bedroom. Vernita and her friend, Shirley Martin, tried desperately to hold the bedroom door closed against defendant and Driskel. Defendant, however, broke down the door and began stabbing the women, while Driskel stabbed the children. Four individuals, including a four-year-old child, died as a result of multiple stab wounds. Collectively, they received over 115 incised wounds. Urica, who was only six years old, also was stabbed repeatedly and left for dead.

Additional evidence in aggravation showed that defendant had a criminal history and an extensive prison disciplinary record. There was evidence that, while incarcerated, defendant threatened correctional officers and assaulted both guards and inmates on several occasions. One correctional officer, who had 27 years of experience, testified that he would rank defendant fourth in terms of dangerousness out of more than a thousand prisoners he had contact with.

Defendant, who was 22 at the time of the murders, never held a legitimate job. He had supported himself by selling drugs. There was also evidence that defendant had been involved with gangs both inside and outside of prison.

In mitigation, the defense showed that defendant had been severely abused as a child and that he suffered from abnormal brain functioning, most probably as a result of head injury. Although defendant had obtained a GED, he had a borderline IQ and had never done well in school. He used drugs and alcohol since the age of nine.

On balance, we cannot say that the mitigation evidence outweighs the seriousness of the crimes and the additional aggravating evidence presented. Furthermore, we have already considered, and rejected, the argument made in defendant's direct appeal that his death sentence is unreasonably disparate from his codefendant's life sentence. For these reasons, we do not find that the sentence of death was excessive or inappropriately applied in this case.

### V. Improper Questions Posed to the Venire

In this claim, defendant argues that he was denied a fair death penalty sentencing hearing because the trial court, when questioning the venire, "suggested that a jury would have to be unanimous as to any findings of mitigating factors."

The State correctly argues that this issue is procedurally defaulted because defendant failed to raise this issue on direct appeal. *People v. Whitehead*, 169 Ill. 2d 355, 371 (1996). It is necessary, however, to consider whether principles of fundamental fairness require that we review the issue.

As stated, fundamental fairness is essentially a cause and prejudice test (see *People v. Mahaffey*, 194 Ill. 2d 154, 173 (2000)), with "cause" defined as "an objective factor that impeded defense counsel's efforts to raise the claim on direct review" and "prejudice" defined as "an error which so infected the entire trial that the defendant's conviction violates due process." *People v. Franklin*, 167 Ill. 2d 1, 20 (1995). Upon review of the record in this case, we have determined that defendant is unable to satisfy the prejudice prong of the "cause and prejudice" test. Even if some of the questions posed to members of the venire were misleading, as defendant contends, the likelihood that this had an effect on the sentencing jury's verdict is too remote to require reversal.

The purpose of *voir dire* is not to instruct the jury,

" '[t]he purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath.' " *People v. Strain*, 194 Ill. 2d 467, 476 (2000), quoting *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993). Defendant does not contend that the trial court failed to adequately screen the venirepersons for bias. The members of the venire who were selected to sit on the jury were fully and properly instructed on their duties with regard to imposition of the death penalty. Thus, any confusion that might have arisen due to the court's preliminary inquiries to members of the venire would have been cured when, at the close of the aggravation/ mitigation phase of the sentencing hearing, defense counsel argued to the jury that "[a]ll of you don't have to decide that there is a mitigating factor, just one," and "it only takes just one to say that there are sufficient mitigating factors which will prevent [defendant] from receiving death" and when the trial court instructed the jury and provided it with verdict forms which accurately stated the requirements for imposition of the death penalty. See *People v. Towns*, 174 Ill. 2d 453, 471-72 (1996). There is no reasonable probability that defendant was prejudiced as a result of the *voir dire* questioning, which occurred long before the jury ever heard any evidence or determined whether defendant was eligible for the death penalty. Defendant's claim of error is waived.

## VI. Cumulative Effect of the Above Errors

Recognizing that each of the claims of error raised in his post-conviction petition and in this appeal, standing alone, may be insufficient to warrant relief, defendant asks this court to assess the fairness of his trial and sentencing hearing after looking at the totality of the

circumstances. He asks this court to decide whether these errors, which individually may be deemed harmless, cumulatively amount to a denial of due process.

This court has recognized that individual errors may have the cumulative effect of denying a defendant a fair hearing (*People v. Hall*, 194 Ill. 2d 305, 350 (2000); *People v. Speight*, 153 Ill. 2d 365, 376 (1992)) and has reversed convictions and sentences when it was clear that the cumulative effect of the errors deprived the defendant of due process (see *People v. Walker*, 91 Ill. 2d 502, 516-17 (1982); *People v. Whitlow*, 89 Ill. 2d 322, 341-42 (1982); *People v. Romero*, 36 Ill. 2d 315, 319-20 (1967)). However, this case does not present such a situation.

None of the claims of error raised by defendant here were found to be of any merit. Thus, whether considered individually or in the aggregate, defendant's claims do not demonstrate a substantial violation of his constitutional rights. There is no basis for granting defendant an evidentiary hearing or any alternate relief requested.

VII. Constitutionality of the Death Penalty Statute

Defendant next contends that the Illinois death penalty statute is unconstitutional because it lacks a burden of persuasion, thus making the death penalty mandatory where the State has proven beyond a reasonable doubt at least one aggravating circumstance and no mitigating evidence is offered.

On more than one occasion, this court has considered and rejected the identical argument presented in this appeal. See *People v. Simms*, 192 Ill. 2d 348, 429 (2000); *People v. Brown*, 172 Ill. 2d 1, 62-63 (1996); *People v. Simpson*, 172 Ill. 2d 117, 152 (1996); *People v. Terrell*, 132 Ill. 2d 178, 227 (1989); *People v. Christiansen*, 116 Ill. 2d 96, 130 (1987); *People v. Williams*, 97 Ill. 2d 252, 265-66 (1983). We adhere to our prior decisions.

Furthermore, we note that when a similar argument was presented in defendant's second direct appeal, this

court upheld the constitutionality of the Illinois death penalty statute, finding that the statute places a burden of persuasion on both the State and the defendant, with the primary burden being on the State to persuade " 'the jury that, as the statute states, there are no mitigating factors sufficient to preclude the sentencer from imposing the sentence of death for which the defendant is eligible.' " *Jackson*, 182 Ill. 2d at 94-95, quoting *People v. Bean*, 137 Ill. 2d 65, 139 (1990). Defendant's claim here must fail.

VIII. Exemption From Death Penalty for Persons Who Require Special Forms of Communicative Assistance

Section 104—22 of the Code of Criminal Procedure of 1963 (725 ILCS 5/104—22 (West 2000)) recognizes that defendants with certain disabilities, who may otherwise be unfit to stand trial, may become fit if special provisions are made or assistance provided. However, the legislature has also determined that any defendant "convicted following a trial under Section 104—22 shall not be subject to the death penalty." 725 ILCS 5/104—26(b) (West 2000). Defendant contends that this exemption renders the death penalty statute unconstitutionally discriminatory, arbitratry and capricious because it exempts from the death penalty a defendant who requires "a translator or needs special assistance because of unfitness due to a physical disability."

The argument posited by defendant has been rejected by this court on previous occasions. This court has held that the death penalty statute is not unconstitutional because it exempts persons in need of special assistance. See *People v. Harris*, 129 Ill. 2d 123 (1989); *People v. Ashford*, 121 Ill. 2d 55, 90 (1988); *People v. Perez*, 108 Ill. 2d 70, 94-95 (1985). Furthermore, this court, in construing section 104—10, has held that the statutory scheme does not intend that those defendants who are merely unable to speak or understand English be exempted from

the death penalty. *People v. Britz*, 123 Ill. 2d 446 (1988). See also *People v. Crews*, 122 Ill. 2d 266, 294 (1988); *People v. Enoch*, 122 Ill. 2d 176, 202-03 (1988); *People v. Foster*, 119 Ill. 2d 69, 105 (1987). In fact, this court has held that any interpretation of sections 104—22 and 104—26(b) that would allow for such an exemption reflects "a serious misunderstanding" of the statutory scheme. *People v. Madej*, 106 Ill. 2d 201, 212 (1985). Because defendant's premise is flawed, there is no merit to his argument that the death penalty statute is unconstitutional.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County dismissing defendant's amended petition for post-conviction relief. We direct the clerk of this court to enter an order setting Tuesday, March 12, 2002, as the date on which the sentence of death entered by the circuit court of Cook County is to be carried out. The defendant shall be executed in the manner provided by law (725 ILCS 5/119—5 (West 1994)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Tamms Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

CHIEF JUSTICE HARRISON, dissenting:

The proceedings which culminated in Jackson's sentence of death were fatally flawed because they did not comport with the new rules enacted by our court governing the conduct of cases in which the State is seeking the death penalty. For the reasons set forth in my dissenting opinion in *People v. Hickey*, 204 Ill. 2d 585, 631-36 (2001) (Harrison, C.J., dissenting), the procedures contained in those rules are indispensable for achieving

an accurate determination of innocence or guilt and are applicable to all capital cases now coming before us. Because Jackson was tried, convicted and sentenced without the benefit of the new rules, his convictions and death sentence should be vacated, and the cause should be remanded to the circuit court for a new trial.

Even if Jackson were not entitled to the benefit of the new rules, his sentence of death could not stand. For the reasons set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law is void and unenforceable because it violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Absent the new rules, there is no basis for altering that conclusion. At a minimum, Jackson's sentence of death should therefore be vacated, and he should be sentenced to a term of imprisonment. 720 ILCS 5/9—1(j) (West 1994). Because he was convicted of murdering more than one victim, the term of imprisonment must be natural life. 730 ILCS 5/5—8—1(a)(1)(c)(ii) (West 1994).

JUSTICE KILBRIDE, also dissenting:

For the reasons set forth in my dissents in *People v. Hickey*, 204 Ill. 2d 585, 636-40 (2001) (Kilbride, J., dissenting), and *People v. Simpson*, 204 Ill. 2d 536, 581-85 (2001) (Kilbride, J., dissenting), I believe this cause should be remanded for a new trial conducted in compliance with the new rules governing capital cases. As I stated in my dissents, the procedures in capital cases prior to this court's adoption of the new rules were inherently unreliable and did not sufficiently protect a defendant's constitutional rights. For this reason, I believe that the new rules should be applied retroactively. Therefore, I respectfully dissent.