**NOTICE**

Decision filed 12/13/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220779-U

NO. 5-22-0779

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

**NOTICE**

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Champaign County. |
| v. | ) ) | No. 21-CF-1184 |
| KIN CONERLY, | ) ) | Honorable Jason M. Bohm, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE SHOLAR delivered the judgment of the court.
Justices Cates and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's armed habitual criminal convictions are reversed where defense counsel was ineffective for stipulating to defendant's prior convictions, because one of the two required convictions cannot serve as a predicate offense for the charge. We remand this case to the circuit court with directions to conduct a full *Krankel* (*People v. Krankel*, 102 Ill. 2d 181 (1984)) hearing, including the appointment of new counsel to evaluate defendant's *pro se* claims of ineffective assistance of trial counsel and then either present any nonfrivolous claims during the hearing or move to withdraw on the basis that there are no nonfrivolous claims.

¶ 2    A Champaign County jury convicted defendant, Kin Conerly, of two counts of armed habitual criminal and one count of reckless discharge of a firearm. On direct appeal, relevant to this disposition, defendant contends that one of the predicate offenses for the armed habitual criminal charges does not qualify as a predicate offense. He further argues that the trial court failed to conduct an adequate inquiry into defendant's posttrial claims of ineffective assistance of counsel

1

and further precluded newly appointed counsel from raising these issues in her posttrial representation of defendant. For the following reasons, we reverse defendant's armed habitual criminal convictions and remand with instructions for the trial court to enter judgments of acquittal on those two charges. Furthermore, we remand to the circuit court with directions to conduct a full *Krankel* hearing on defendant's remaining claims, including the appointment of new counsel to provide representation on defendant's nonfrivolous claims of ineffective assistance of trial counsel.

¶ 3                                  I. BACKGROUND

¶ 4      On October 4, 2021, the State charged defendant by information with several offenses related to an incident that occurred on September 30, 2021. Counts I, II, and IV alleged defendant committed the offenses of armed habitual criminal, Class X felonies in violation of section 24-1.7(a) of the Criminal Code of 2012 (Code) (720 ILCS 5/24-1.7(a) (West 2020)); count III alleged the offense of reckless discharge of a firearm, a Class 4 felony, in violation of section 24-1.5(a) of the Code[1] (*id.* § 24-1.5(a)).

¶ 5      On January 21, 2022, appointed counsel filed a motion for forensic testing. According to the motion, because the Champaign Police Department informed the crime lab that defendant was seen discharging the weapon, the Illinois State Police Crime Lab declined to analyze gunshot residue (GSR) swabs taken from the defendant. On February 23, 2022, the public defender withdrew as counsel, and trial counsel became defendant's attorney. Because the motion for forensic testing filed by the public defender had yet to be heard, on April 27, 2022, the State filed a motion *in limine* regarding the GSR kit. The State argued that trial counsel informed the State that he did not want the previously filed motion for forensic testing heard or withdrawn, because

---

[1]The State dismissed count IV prior to the start of the trial.

part of his trial strategy was to argue that the State's failure to test the GSR kit "is a pillar of reasonable doubt." As relief, the State asked that, should the defense mention the lack of GSR testing during the trial, (1) it be permitted to tell the jury that defendant sought the GSR testing and abandoned that request, and (2) that the jury be instructed that defendant had the right to have the testing completed and that the testing would have been completed if the defendant so requested. The State relied on *People v. Mudd*, 2022 IL 126830, for this request. Following a hearing on the motion, the trial court offered to have an order entered directing the Illinois State Police Crime Lab to conduct the testing. After consultation with defendant, the defense declined to have the court enter an order for the testing. The court noted that it believed *Mudd* to be applicable, and that should this become an issue at trial, the State may be able to mention that defendant had the ability to have the testing completed.

¶ 6      Prior to the start of the trial, the parties stipulated that defendant had previously been convicted of forcible felonies that served as predicate offenses for defendant's armed habitual criminal charges. The first part of the stipulation was to be read to the jury, and stated that "on September 30th, 2021, the Defendant had previously been convicted of two prior qualifying offense[s] as required for the offense of Armed Habitual Criminal." The second part of the stipulation was not to be read to the jury, and it provided details regarding the two prior felony convictions. It stated, in pertinent part, that "[t]he parties furthermore agree that on June 12, 2006, in Champaign County case number 2006-CF-384, the Defendant was convicted of the offense of Aggravated Battery, a class 3 forcible felony based on the facts of the case, and judicial notice of said conviction is proper." Both parts of the stipulation were signed by the prosecutor and trial counsel for defendant.

¶ 7    The matter proceeded to a jury trial on May 24, 2022. The first piece of evidence presented to the jury was the first part of the stipulation between the parties. Next, the State called Gabriel Lafountain. Lafountain testified that on September 30, 2021, he parked outside his apartment at Gramercy Park and sat in his car with a friend. A man walked up and looked in the car. A woman walked up, and as they walked past, the man fired a gun into the air. Lafountain identified a video of the shooting and testified that the video "truly and fairly and accurately depict[ed] the events as [he] remember[ed] them on that evening."

¶ 8    The video was admitted without objection from trial counsel and was published to the jury.[2] During playback, the State paused the video at various points and Lafountain described what was happening in the video.

¶ 9    Our review of the video reveals that a white Jeep pulled into the parking lot and parked five spaces away from Lafountain's car. A man in a white shirt, later identified as defendant, exited the Jeep and walked behind the other parked cars until he stopped behind the car next to Lafountain's car. He appeared to be carrying a drink. After pausing for a moment, the man in the white shirt walked alongside the driver's side of Lafountain's car and looked in the passenger compartment. Once he was toward the front of Lafountain's car, the man in the white shirt set what appeared to be the drink on the hood of the car next to Lafountain's car. The female passenger from the Jeep joined the man in the white shirt at the front of Lafountain's car.[3] The man in the white shirt picked up the item that he had set on the hood of the other car, and both he and the

---

[2]We have reviewed the video, which is part of the record on appeal. It is a compilation video that appears to have been created using eight film clips captured by three different cameras at the apartment complex. Certain parts of the video are slowed down or sped up, depending upon what is occurring in the video. The time stamps from one segment to the next appear seamless, running from 22:48:38 to 22:59:10. The entire video played for the jury is 5:07 long (excluding the introduction and the conclusion), meaning that 10:22 of real time video was condensed into 5:07 for the jury. The video does not have audio.

[3]This woman was later identified as Skylar and was referred to as defendant's girlfriend. Her last name does not appear in the record.

4

woman walked in front of Lafountain's car. As he walked in front of Lafountain's car, the man in the white shirt appeared to look in Lafountain's direction before he pointed his right arm into the sky. Two flashes of light appeared at the end of the right hand of the man in the white shirt, followed by a third flash of light a moment later. The man in the white shirt and Skylar walked away from Lafountain's car and entered an apartment building. Through a lit window, the pair appeared to enter an apartment. A short time later, the man in the white shirt and Skylar exited the apartment and returned to the parking lot. The man in the white shirt briefly engaged in conversation with Lafountain. The police arrived shortly thereafter, and the man in the white shirt and Skylar again walked toward the apartment building. Lafountain approached the police and pointed them to the man in the white shirt. The video ended with the police approaching the man in the white shirt outside his apartment building.

¶ 10    Lafountain testified that he knew that a firearm had been discharged because of the sound that it made. Having heard something hit his car, Lafountain exited the vehicle to see whether there were any holes in his car. There were not.

¶ 11    On cross-examination, Lafountain admitted that he could not identify defendant as the shooter. Lafountain explained that he was not paying attention to defendant until after the shots fired, and at that point the shooter walked away from him. He also explained that the person who fired the gun and the person that he pointed out to the police was wearing the same clothes and was with the same woman. Lafountain also explained that, when asked to identify the defendant, he "didn't want to get close." Regarding the fact that the video he just watched appeared to speed up in portions, Lafountain said, "This is exactly what happened that night."

¶ 12    Timothy Atteberry testified that he was a patrol officer for the City of Champaign, and that he responded to the call that night. After he arrived, he met with Lafountain. Lafountain pointed

5

to the person who discharged the firearm. Atteberry testified that the person Lafountain pointed out was the defendant, who Atteberry identified in court.

¶ 13    Benjamin Newell testified that he was a patrol sergeant with the Champaign Police Department. Initially, when he arrived on the scene, he was there to assist where needed. Newell spoke with defendant. They spoke outside defendant's apartment building, which was later identified as being in building 301 of the apartment complex. They also spoke in Newell's squad car. Defendant initially stated that he heard gunshots, but that he had nothing to do with the shooting. Defendant later told Newell that it was Skylar who fired the gun. Back at the station, they spoke some more. On cross-examination, Newell testified that when the police told defendant that they were going to complete a gunshot residue test (GSR test), defendant did not want to comply. Once Newell explained that he had to complete the GSR test, defendant did not resist the efforts. Newell admitted that Skylar was not subjected to GSR testing. On redirect, Newell explained that they did not ask Skylar to take a GSR test because there was no evidence to corroborate defendant's claim that Skylar was the person who fired the gun.

¶ 14    Blake Wheling testified that he was a patrol officer for the Champaign Police Department, and that he was called to the scene of the investigation. One of Wheling's roles was to collect evidence. Wheling found three 9-millimeter shell casings on the ground near Lafountain's car. Wheling also participated in the search of defendant's apartment. During the search, he found a Smith & Wesson revolver in a laundry basket in a child's room. He photographed the revolver and waited for Sergeant Warren to swab the pistol for deoxyribonucleic acid (DNA) evidence before removing the firearm from the basket. Wheling also recovered mail addressed to defendant at that address.

6

¶ 15    James Warren testified that he was a patrol sergeant for the Champaign Police Department. He was on scene the night of the incident and reviewed the video of the incident. Warren explained that the video security system at the apartment complex was provided by Watchtower Security (Watchtower). Using a computer in his squad car, he accessed a live feed from the cameras. He further explained that every 30 minutes, the videos are placed on a server, and that "historical data" can be accessed from his squad car computer for a period of four days. For any video older than that, the police would have to make a request from the company. Warren testified that the footage fairly and accurately depicted what the cameras were able to capture. Warren identified the video compilation previously played for the jury. Warren explained that by using software, he was able to create an "event" that is reviewed by Watchtower personnel. Warren provided Watchtower with a description of what he wanted, *e.g.*, the cameras and the time frames, and Watchtower subsequently provided Warren with a link to download the requested footage. On cross-examination, Warren admitted that he did not know who at Watchtower was responsible for putting the video compilation together.

¶ 16    The video footage was again published to the jury, and this time Sergeant Warren narrated for the jury. Trial counsel did not object to Warren's narration of the events that occurred on the video, and no limiting instruction was requested or given. Warren described the location of the cameras within the apartment complex and the direction in which they pointed. Warren explained that the video may speed up when nothing of significance occurs, and it may slow down at critical moments. Warren testified that when a firearm is discharged, there is generally a muzzle flash. After a portion of the video played, Warren testified that he saw "two very distinct muzzle flashes, and a third that [was] mostly viewable, but not as clear as the first two." The prosecutor asked Warren, "there were two individuals you could see [on the video], one wearing a white shirt and

7

one wearing dark clothes. Who did you observe discharging the firearm?" Warren answered, "Mr. Conerly." Warren also testified that part of the video showed shadows of two people who he believed to be defendant and Skylar walking toward building 301. Warren believed that one of the shadows appeared to be holding a handgun in the right hand, and that he believed this was defendant's shadow. A screenshot of this shadow was introduced into evidence. Warren also participated in the search of defendant's residence in building 301. During the search, he found a Beretta pistol hidden underneath the drawer of the stove. An aftermarket laser was attached to the pistol. Warren personally collected DNA swabs from the weapons before they were packaged as evidence.

¶ 17    Various police officers testified regarding chain of custody issues and the forensic testing of the evidence seized. Other testimony elicited at trial established (1) that the GSR test was never analyzed by the crime lab, because the science does not allow the examiner to differentiate between someone who fired a gun and someone who was in close proximity to a firearm when it was discharged; (2) that the shell casings recovered from the ground near Lafountain's car were fired from the Beretta pistol that was recovered from under the stove in defendant's residence; (3) that the DNA swab taken from the grip of the Beretta revealed the presence of DNA from three individuals and that the statistical support for this profile belonging to defendant and two unknown individuals as one in 23 quadrillion; (4) that the DNA swab taken from the grip of the Smith & Wesson likewise revealed the presence of DNA from three individuals and that the statistical support for this profile belonging to defendant and two unknown individuals as one in 73 septillion; and (5) that no fingerprints suitable for comparison were found on either firearm, which is not unusual due to the curved, uneven, and textured surfaces of firearms.

¶ 18 Detective Lance Carpenter from the Champaign Police Department testified that he reviewed some of the phone calls that defendant made from the county jail shortly after his arrest. The State played for the jury two of the calls that defendant made the morning after his arrest. The first was a call to his mother, who then called Skylar. Defendant's mother relayed information back and forth between defendant and Skylar. In this conversation, defendant asked his mother whether Skylar "got them girlfriends." When his mother told him that Skylar did not have the "girlfriends," defendant told his mother, "Tell her she needs to go get them girlfriends. *** Tell her ASAP." The second call was between defendant and Skylar. Defendant asked whether Skylar had been to his apartment, and told her to "Hurry up and get both them girls." After the jury heard the calls, Detective Carpenter testified that he worked on the Champaign County Street Crimes Task Force. The State asked Carpenter whether, in his experience as a detective, "people use different names or codes when trying to talk about either illicit firearms or contraband?" Trial counsel's objection that this was "speculative" was overruled. Carpenter confirmed that people sometimes use different names or codes when talking about firearms and contraband.

¶ 19 The State rested. The trial court denied defendant's motion for a directed verdict. Defendant rested without presenting any evidence.

¶ 20 During closing argument, the prosecutor argued that "[t]he defendant's only contention when he talks to the police is that he wasn't the one shooting. And that's not supported by any other evidence." The State also argued that consciousness of guilt could be inferred from both statements and omissions made by defendant during the calls he made from the jail the morning after his arrest, relying specifically on defendant's statement that "[t]hey didn't see me do it. They are relying on the word of a witness" and defendant's failure to ask Skylar why she did not "tell the police what you did" and "[w]hy didn't you own up to your guns?" During his closing

9

argument, defense counsel argued that defendant's DNA being part of the mixed DNA on the firearms could have been transferred to the firearms by another person who had contact with defendant, thus suggesting that this other person could have been responsible for defendant's DNA appearing on the firearms. On rebuttal, the prosecutor argued that defendant had not questioned the DNA experts on whether transfer DNA was possible in this case. The prosecutor also noted that the State had the burden of proof, but that the defense had "the same ability [as the State] to subpoena witnesses, call witnesses, [and] have the evidence tested." The State also argued, on rebuttal, that defendant initially refused to be swabbed for GSR testing, and that this refusal indicated defendant's consciousness of guilt. Defense counsel did not object to any of these statements. The jury found defendant guilty of all three counts.

¶ 21     Trial counsel filed a posttrial motion challenging the sufficiency of the evidence. The posttrial motion also raised three claims of error: (1) defendant's right to privacy was invaded by the State listening to his calls from the jail and the subsequent use of those calls during the trial; (2) the trial court erred by instructing the jury, consistent with *Mudd*, that both parties had the ability to request forensic testing of evidence; and (3) the jury venire did not include anyone "identifying themselves as 'black' " and claimed that the Champaign County process for selecting jurors was unfair. Following a hearing, defendant's motion for a new trial was denied and the matter was set for sentencing.

¶ 22     On the date of the sentencing hearing, trial counsel filed a motion to withdraw as counsel. The motion noted that defendant expressed dissatisfaction with trial counsel and believed that trial counsel was ineffective. The trial court noted that defendant expressed some dissatisfaction with counsel in the presentence report and asked defendant about his complaints. Defendant echoed his complaints from the presentence report, telling the court that he had never seen the discovery in

the case, including the video, that he had to have family members and friends tell counsel to call him, and that they never sat down to "come up with a strategy for trial." Defendant also told the court that he preferred to proceed with the sentencing and to put this behind him. The court did not make any further inquiries of defendant, and asked trial counsel whether he believed that he could effectively represent defendant at sentencing. The court did not ask counsel about defendant's accusations. Trial counsel expressed concern about representing defendant at the sentencing. Characterizing the problems as a breakdown in the attorney-client relationship, the court granted the motion to withdraw as counsel. The public defender was reappointed to represent defendant.

¶ 23    A status conference was held one week later. One purpose of the conference was to schedule the sentencing hearing. Appointed counsel stated that she was familiar with the file and that she only needed time to talk to defendant. She then sought clarification that "this is only for sentencing, it's not in anticipation of any other motions or anything else; correct?" The court responded, "I'm not anticipating anything, just sentencing, yes."

¶ 24    It does not appear that defendant filed any *pro se* motions prior to the sentencing hearing. However, at the sentencing hearing, the public defender provided the court with letters written on defendant's behalf, and noted that one of the letters, a letter from a Michael Woolf, contained a document entitled "Motion to Reconsider Sentence." The letter stated that the document had not yet been filed, but that defendant wanted the court "to be apprised of this." The unfiled motion contained allegations of ineffective assistance of counsel. Defense counsel and the trial court considered the motion to be premature since defendant had not yet been sentenced. In his allocution, defendant noted that his prior aggravated battery conviction should not count as a predicate offense for the armed habitual criminal charges. The trial court sentenced defendant to

11

25 years in the Illinois Department of Corrections on the armed habitual criminal charges and 3 years in prison on the reckless discharge of a firearm offense.

¶ 25 After sentencing, defendant filed a motion to proceed *pro se* on his newly filed *pro se* motion to reconsider sentence. Although defendant's motion to reconsider sentence claimed that his sentence was excessive, the motion primarily focused on defendant's claim that trial counsel was ineffective. Defendant again raised the use of defendant's prior convictions as predicate offenses for the armed habitual criminal charges. In addition to claims regarding the use of the predicate offenses and the use of the stipulation, defendant alleged counsel was ineffective for failing to file a motion to "quash arrest and suppress evidence" and for "accusing defendant of shooting a gun" during closing argument. At a hearing on defendant's motion to proceed *pro se*, defendant told the court that he believed he was being forced to proceed *pro se* because appointed counsel would not present his motion in its entirety. Defense counsel explained that she told defendant that some of the issues he wanted to raise were not appropriate for a motion to reconsider the sentence. Since defendant told the trial court he preferred representation on a motion to reconsider sentence, defendant's motion to proceed *pro se* was denied. Thereafter, the public defender filed a motion to reconsider sentence. It did not raise defendant's claims of ineffective assistance of counsel. The court denied the motion to reconsider sentence.

¶ 26 This timely appeal followed.

¶ 27                                      II. ANALYSIS

¶ 28 Defendant raises numerous issues in this appeal. First, defendant argues that this court should reverse his two convictions for armed habitual criminal (AHC), because one of the two predicate offenses used to prove the offenses did not qualify as a predicate offense for AHC. As such, defendant argues that the evidence was insufficient to prove him guilty beyond a reasonable

12

doubt.[4] The State argues that since trial counsel stipulated to the predicate offenses, defendant is precluded from challenging the sufficiency of the evidence.

¶ 29                                    A. Armed Habitual Criminal

¶ 30    Because the underlying facts are not in dispute, both the defendant and the State agree that the standard of review is *de novo*. *People v. Smith*, 191 Ill. 2d 408, 411 (2000). We agree.

¶ 31    The AHC statute provides, in pertinent part, that "[a] person commits the offense of being an armed habitual criminal if he or she receives, sells, possesses, or transfers any firearm after having been convicted a total of 2 or more times of any combination of the following offenses: (1) a forcible felony as defined in Section 2-8 of this Code."[5] 720 ILCS 5/24-1.7(a)(1) (West 2020). Section 2-8 of the Code defines "forcible felony" as "treason, first degree murder, second degree murder, predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual assault, robbery, burglary, residential burglary, aggravated arson, arson, aggravated kidnaping, kidnaping, *aggravated battery resulting in great bodily harm or permanent disability or disfigurement* and any other felony which involves the use or threat of physical force or violence against any individual." (Emphasis added.) *Id*. § 2-8.

¶ 32    Defendant contends that his aggravated battery conviction cannot be used as a predicate offense for AHC. In Champaign County case No. 06-CF-384, defendant was originally charged with at least two counts of aggravated battery. Count I alleged defendant committed aggravated battery in violation of subsection 12-4(b)(1) of the Criminal Code of 1961. 720 ILCS 5/12-4(b)(1)

---

[4]Defendant has not challenged the sufficiency of the evidence regarding the reckless discharge conviction.

[5]The AHC statute also lists other offenses that qualify as predicate offenses. Those offenses are not pertinent to this appeal.

(West 2006).[6] That subsection made the use of a deadly weapon during the commission of a misdemeanor battery an aggravating factor, thereby elevating a misdemeanor battery to a Class 3 felony. Count II alleged defendant committed aggravated battery in subsection 12-4(a). *Id.* § 12-4(a). That subsection elevates a misdemeanor battery to a Class 3 felony if the person, in committing a battery, caused great bodily harm to the victim. Defendant pled guilty and was convicted of count I, the count alleging the use of deadly weapon during the commission of the battery. Count II, alleging great bodily harm, was dismissed. Since defendant pled guilty to an aggravated battery charge that did not contain great bodily harm or permanent disability or disfigurement as an element, defendant argues that it cannot be used as a predicate offense under the AHC statute, and therefore the evidence was insufficient to convict him of AHC.

¶ 33    The State responds that defendant cannot challenge the use of his prior aggravated battery conviction because trial counsel stipulated to its use as a predicate offense for the AHC charges. We agree with the State.

¶ 34    Since this case was briefed, the Illinois Supreme Court decided *People v. Gray*, 2024 IL 127815 (March 21, 2024, *modified upon denial of rehearing* May 28, 2024). In *Gray*, the defendant was charged with AHC, and the parties stipulated to the two predicate offenses. *Id.* ¶ 4. On appeal, the defendant challenged one of the predicate offenses contained in the stipulation, arguing that it was a 2002 felony conviction based upon an offense that the defendant committed when he was 17 years old. *Id.* ¶ 18. The defendant argued that "under the law in effect in 2016 [at the time that the defendant committed the AHC offense], he would have been tried and adjudicated as a juvenile for the 2002 offense, so the 2002 conviction was not a qualifying conviction under the armed

---

[6]Section 12-4 was renumbered as 720 ILCS 5/12-3.05. See Pub. Act 96-1551, art. 1, § 5 (eff. July 1, 2011). The equivalent of section 12-4(b)(1), the subsection defendant pled guilty to in 06-CF-384, is now found in section 720 ILCS 5/12-3.05(f)(1).

habitual criminal statute." *Id.* The *Gray* court did not reach the issue of whether the defendant's 2002 conviction would qualify as a predicate offense for the AHC statute, but instead ruled that defense counsel's stipulation to the predicate offenses satisfied the State's obligation to prove those facts, and that the defendant could not directly attack the sufficiency of the evidence. *Id.* ¶ 28.

¶ 35    *Gray* is controlling, and for this reason, defendant cannot directly attack the sufficiency of the evidence. The *Gray* court noted, however, that "[a]lthough defendant cannot directly attack the sufficiency of the evidence, defendant may argue that defense counsel's agreement to the stipulation constituted ineffective assistance of counsel." *Id.* ¶ 29. Applying the well-known standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the *Gray* court found that the defendant could not prove ineffective assistance of counsel because the defendant conceded, in his reply brief, that he had a different felony conviction that qualified as a predicate offense. *Id.* ¶ 32. For this reason, the defendant could not meet the prejudice prong of the *Strickland* standard. *Id.* ("A defendant must show both unreasonable performance and prejudice to prevail on a claim of ineffective assistance of counsel ***.").

¶ 36    Here, defendant argues, in the alternative, that trial counsel was ineffective for stipulating to defendant's aggravated battery conviction as a predicate offense. The record is sufficient to resolve this particular claim of ineffective assistance of counsel on its merits. Therefore, we find it unnecessary to remand this to the trial court on this specific issue to develop the record. *People v. Veach*, 2017 IL 120649, ¶ 48.

¶ 37    Claims of ineffective assistance of counsel are analyzed under the standard set forth in *Strickland*. " 'To demonstrate ineffective assistance of counsel, a defendant must show that (1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance prejudiced the defendant in that, absent counsel's deficient performance,

there is a reasonable probability that the result of the proceeding would have been different.' ” *Gray*, 2024 IL 127815, ¶ 29 (quoting *People v. Jackson*, 2020 IL 124112, ¶ 90).

¶ 38 Defendant argues that because his 2006 aggravated battery conviction did not involve “great bodily harm” and does not qualify as a predicate offense, trial counsel's performance fell below an objective standard of reasonableness. The State counters that defendant's 2006 case contained allegations of great bodily harm to the victim, and that the stipulation in this matter stated that “[t]he parties furthermore agree that on June 12, 2006, in Champaign County case number. 2006-CF-384, the Defendant was convicted of the offense of Aggravated Battery, *a class 3 forcible felony based on the facts of the case ***.*” (Emphasis added.) The State further argues with this language in the stipulation, coupled with the prosecutor's arguments during the hearing to reconsider defendant's sentence, it is irrelevant that the 2006 charging document did not specifically allege great bodily harm. Defendant responds that “[i]t would be fundamentally unfair to allow the State to use the stipulation in this case to effectively alter the terms of the plea deal in 2006-CF-384.” For the reasons below, we agree with defendant.

¶ 39 “Infliction of great bodily harm is an essential element of the offense of aggravated battery.” *People v. Figures*, 216 Ill. App. 3d 398, 400 (1991). The question of whether the victim's injuries constitute great bodily harm is a question of fact to be determined by the trier of fact. *People v. Crespo*, 203 Ill. 2d 335, 344 (2001). In 2006, defendant negotiated for and received a conviction for an aggravated battery charge that did not contain the essential element of great bodily harm. Beginning with its 1996 decision in *People v. Evans*, 174 Ill. 2d 320 (1996), the Illinois Supreme Court has “repeatedly held that fully negotiated pleas *** are governed by principles of contract law.” *People v. Absher*, 242 Ill. 2d 77, 87 (2011). As a result, the courts in

16

Illinois have repeatedly determined that allowing a party to unilaterally modify the terms of a fully negotiated plea agreement is contrary to the principles of contract law. *Id.*

¶ 40 Pursuant to the parties' agreement in 2006-CF-384, defendant pled guilty to aggravated battery, the aggravating factor being that defendant possessed a deadly weapon at the time that he committed the battery. This is not a forcible felony under section 2-8 of the Code. See 720 ILCS 5/2-8 (West 2020). Defendant did not plead guilty to an aggravated battery wherein the aggravating factor was "great bodily harm." If he had done so, then the 2006 conviction would be for a forcible felony (*id.*) and could have been used as a predicate offense for AHC. Under the State's theory, it can reach back in time to resolved cases in an effort to redefine them as forcible felonies in the absence of a finding by a trier of fact that the essential element of "great bodily harm" existed. Not only do we find that this would this be fundamentally unfair to a defendant, but we also fail to see how such an approach would fulfill the necessary elements of the AHC statute, which requires that a defendant must have committed the newly alleged conduct "*after having been convicted a total of 2 or more times of any combination*" of the enumerated offenses. (Emphasis added.) *Id*. § 24-1.7(a)(1). Aggravated battery with a deadly weapon is not an enumerated offense, and even if great bodily harm occurred in defendant's 2006 offense, defendant did not admit to that element and was not convicted of that offense. Therefore, we find that trial counsel's stipulation to defendant's 2006 aggravated battery conviction as a predicate offense under the AHC statute fell below an objective standard of reasonableness.

¶ 41 Next, we must determine whether defendant suffered prejudice as a result of trial counsel's deficient performance. See *Gray*, 2024 IL 127815, ¶ 32 ("A defendant must show both unreasonable performance and prejudice to prevail on a clam of ineffective assistance of counsel; defendant cannot prevail if he fails to show one or the other."). To establish prejudice under the

17

*Strickland* standard, the defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Jackson*, 205 Ill. 2d 247, 259 (2001). The prejudice element may also be satisfied if the defendant is able to show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *Id.* Based on the record before us, defendant has demonstrated prejudice.

¶ 42    By stipulating that defendant's 2006 aggravated battery conviction counted as one of two necessary predicate offenses, trial counsel relieved the State of its burden of proof on an essential element of the offense of AHC. Unlike the defendant in *Gray*, defendant here has not conceded that he has another predicate conviction. Further, looking at the presentence investigation report contained in the record, it does not appear that defendant had a second prior conviction that would qualify as a predicate offense. Under these circumstances, and in the absence of any evidence in the record supporting a second conviction for a predicate offense, trial counsel's stipulation that defendant's 2006 conviction for aggravated battery was a predicate offense for the purposes of the AHC statute rendered the results of the trial unreliable.

¶ 43    For these reasons, we reverse defendant's convictions for AHC. Having reached this conclusion, we next consider the double jeopardy implications of our decision. Although we have reversed defendant's AHC convictions based upon a finding of ineffective assistance of counsel, in the absence of trial counsel's unreasonable performance, the record demonstrates that the State could not have presented sufficient evidence to sustain defendant's AHC convictions. The State chose to use defendant's 2006 aggravated battery conviction as a predicate offense for defendant's AHC charges. As discussed, defendant's 2006 aggravated battery conviction is legally insufficient as a predicate offense and cannot sustain defendant's AHC convictions. "The double jeopardy

18

clause prohibits retrial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to present in the first proceeding." *People v. Lopez*, 229 Ill. 2d 322, 367 (2008). Accordingly, as to the AHC convictions, we remand this to the trial court to enter judgments of acquittal in defendant's favor.

¶ 44                                    B. *Krankel*

¶ 45    Defendant's remaining contentions are raised as plain error and, in the alternative, as ineffective assistance of counsel. Defendant argues trial counsel was ineffective for (1) failing to object to the admission of the surveillance video on foundational grounds; (2) failing to object to Sergeant Warren's narration of the surveillance video, including Warren's testimony regarding muzzle flashes and a still photo of a shadow that Warren opined was a firearm in defendant's hand; (3) failing to object to and preserve alleged errors occurring during *voir dire*; (4) failing to object to portions of the State's closing and rebuttal arguments wherein defendant contends the State shifted the burden of proof to the defendant; (5) failing to object to the admission of portions of defendant's calls from the jail that contained discussions of defendant's unrelated domestic battery charge; and (6) failing to properly preserve the issue regarding Detective Carpenter's testimony insinuating that defendant's use of the word "girlfriends" during jail calls was code for "guns." We note that defendant's oral statement to the trial court on the date this matter was initially set for sentencing claimed that trial counsel never showed him the discovery and never discussed trial strategy with him. Defendant's *pro se* motion to reconsider sentence focused primarily on his claim that trial counsel was ineffective, based upon counsel's failure to file a motion to quash arrest and suppress evidence. On appeal, defendant argues that these issues, standing alone or cumulatively, denied him the right to a fair trial.

19

¶ 46    We first turn our attention to defendant's allegation that the trial court did not make an adequate inquiry into his *pro se* claims of ineffective assistance of counsel. Pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny, whenever a defendant makes a *pro se* posttrial claim of ineffective assistance of counsel, the court must first determine the factual basis of the claim. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). "[A] *pro se* defendant is not required to do any more than bring his or her claim to the trial court's attention." (Internal quotation marks omitted.) *People v. Ayres*, 2017 IL 120071, ¶ 11. He or she may do so through a written motion, orally, or through a letter or note to the court. *Id.* In conducting a preliminary *Krankel* inquiry, some interchange between the court and defense counsel regarding the facts and circumstances of the defendant's claims is permissible and usually necessary. *Id.* ¶ 12. Additionally, the court may discuss the allegations with the defendant, and it may base its evaluation of the defendant's claims on its knowledge of defense counsel's performance at trial. *Id.* If the claims lack merit or pertain only to trial strategy, then no further action by the court is necessary. *Id.* ¶ 11. If the allegations show possible neglect of the case, however, the court should appoint new counsel to represent the defendant and hold a hearing on the defendant's ineffective assistance of counsel claim. *People v. Roddis*, 2020 IL 124352, ¶¶ 35-36. "Whether the trial court properly conducted a *Krankel* preliminary inquiry presents a legal question that we review *de novo*." *Jackson*, 2020 IL 124112, ¶ 98.

¶ 47    In the instant case, immediately prior to the scheduled sentencing hearing, trial counsel appeared before the court and filed a motion to withdraw as counsel. The trial court, noting that defendant expressed dissatisfaction with trial counsel's performance at trial in the presentence report, asked defendant about his complaints. Defendant answered with allegations that counsel failed to show him discovery and did not discuss trial strategy with defendant. The trial court did

20

not ask for counsel's response to the allegations or find that allegations showed possible neglect of the case. Instead, the court characterized the problem as a breakdown in the attorney-client relationship and allowed trial counsel to withdraw and reappointed the public defender.

¶ 48    While new counsel appeared on defendant's behalf, there is no indication she was proceeding as *Krankel* counsel. At a status hearing following the reappointment of the public defender, the trial court judge noted that he "appointed the Public Defender to represent [defendant] so we could have a sentencing hearing." The court noted that the "[t]he presentence report has already been prepared. The post-trial motions have already been heard, but we need to do sentencing." Shortly thereafter, appointed counsel asked the court, "And, again, this is only for sentencing, it's not in anticipation of any other motions or anything else, correct?" The court responded, "I am not anticipating anything, just sentencing, yes."

¶ 49    Although the court allowed trial counsel to withdraw, it characterized its rationale as being due to a breakdown in the attorney-client relationship. "Allowing trial counsel to withdraw and appointing new posttrial defense counsel does not satisfy *Krankel* procedure." *People v. Reed*, 2018 IL App (1st) 160609, ¶ 51. Further, although it is unclear whether appointed counsel understood that she could act as *Krankel* counsel, it is clear that defendant's claims of ineffective assistance of counsel were never addressed in the trial court. Defendant's oral statement to the trial court and his subsequent written motion were sufficient to trigger a *Krankel* inquiry. *Ayres*, 2017 IL 120071, ¶ 11. "The common law procedure available under *Krankel* is intended to address fully a defendant's *pro se* posttrial claims of ineffective assistance of counsel and thus potentially limit issues on appeal." *People v. Jolly*, 2014 IL 117142, ¶ 38. "By initially evaluating the defendant's claims in a preliminary *Krankel* inquiry, the circuit court will create a necessary record for any claims raised on appeal." *Id.*

21

¶ 50    Despite the fact that defendant's *pro se* motion to reconsider sentence raised claims of ineffective assistance of trial counsel, the record does not reflect that the court ever made further inquiry into defendant's allegations. Even after new counsel appeared, there is no indication in the record that any inquiry into defendant's ineffective assistance allegations occurred. It is evident that the court and the public defender both missed opportunities to address defendant's claims. The court's failure to make an adequate inquiry into defendant's claims was an error that requires remand to the trial court. "[F]ailure to conduct a preliminary *Krankel* inquiry precludes appellate review." *Id.* (explaining *Moore*, 207 Ill. 2d at 81).

¶ 51    Based upon defendant's numerous claims of ineffective assistance of counsel, and the fact that defendant demonstrated that trial counsel was ineffective for stipulating to defendant's 2006 aggravated battery conviction as a predicate offense for the purposes of the AHC charges, we conclude that this matter must be remanded to the trial court for the appointment of new counsel and a full *Krankel* hearing. New *Krankel* counsel must " 'independently evaluate defendant's *pro se* allegations' and 'present those with merit to the trial court during the second stage adversarial hearing.' " *Reed*, 2018 IL App (1st) 160609, ¶ 52 (quoting *People v. Downs*, 2017 IL App (2d) 121156-C, ¶ 49). "If no meritorious claims are found, *Krankel* counsel should withdraw." *Id.* (citing *Downs*, 2017 IL App (2d) 121156-C, ¶ 51). Because we reverse defendant's AHC convictions for ineffective assistance of counsel and remand for a full *Krankel* hearing, we need not consider the merits of the remaining issues on appeal.

¶ 52                                III. CONCLUSION

¶ 53    For the foregoing reasons, we reverse defendant's convictions for armed habitual criminal where trial counsel was ineffective for stipulating to an improper predicate offense for AHC. Based upon the trial court's failure to conduct a proper *Krankel* inquiry, we remand for the appointment

22

of new counsel to represent defendant on his remaining claims of ineffective assistance of counsel. We take no position on the merits of such claims.

¶ 54    Reversed in part and remanded for further proceedings.